**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JESSICA GLENDENING, as next friend
of G.W.; AUDRA ASHER, as
next friend of L.P.; COLIN SHAW, as
next friend of C.B. and N.K.; and LAURA
VALACHOVIC, as next friend of E.K.,

       *Plaintiffs*,

v.

LAURA HOWARD, Secretary of Kansas
Department of Aging and Disability
Services, in her official capacity,
MIKE DIXON, State Hospitals
Commissioner, in his official capacity, and
LESIA DIPMAN, Larned State Hospital
Superintendent, in her official capacity,

       *Defendants*.

Case No. 22-cv-4032

## COMPLAINT – CLASS ACTION

Plaintiffs, on behalf of themselves and others similarly situated, bring this action under 42

U.S.C. § 1983, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and §§ 1 and

18 of the Kansas Bill of Rights, and allege as follows:

## INTRODUCTION

1.    This is a class action for declaratory and injunctive relief to reduce the

unconstitutional, unlawful, and harmfully long wait times for competency evaluation and

competency restoration treatment at Larned State Hospital ("Larned").

2.    Pursuant to K.S.A §§ 22-3302 and 22-3303, the Kansas Department of Disability

and Aging Services ("KDADS") is required to provide competency evaluations and competency

restoration treatment for individuals in custody when competency to stand trial is called into

question. The Fifth Amendment of the U.S. Constitution provides that individuals must be

competent to stand trial and prosecuting an individual who is not competent violates the due process clause of the Fifth Amendment. *See* U.S. Const. Amend. 5; *Pate v. Robinson*, 383 U.S. 375, 378 (1966) (recognizing that conviction of someone deemed legally incompetent violates due process). Kansas law, therefore, requires that when an individual's competency to stand trial is called into question, KDADS must provide an evaluation and, if necessary, treatment services. While Kansas law does not require KDADS to conduct evaluations and restoration treatment at a particular facility, the agency has relied primarily on Larned to complete these services.

3.    KDADS is violating its statutory duties by failing to provide competency evaluation or restoration treatment services to pre-trial detainees in a constitutional manner. Currently, individuals charged with crimes who have had their competency to stand trial questioned by the court, or who have already been deemed incompetent to stand trial and require competency restoration treatment, spend months waiting for bed space at Larned to receive these services. Because of KDADS' failure to provide mental health services and/or treatment in the most integrated setting appropriate, and provide services at Larned in a timely fashion, the current waitlist for a competency evaluation or treatment bed at Larned is 11 months long.

4.    As a result, individuals charged with crimes languish in county jails, where they receive little treatment and are housed in untherapeutic environments that can result in further decline in mental health and stability, self-harm, and continued threats to their safety and well-being. Due to the egregiously long wait for bed space at Larned, some individuals spend more time in county jails, pretrial, waiting to be admitted to Larned than they would ever receive as a sentence if convicted.

5.    Plaintiffs, who are all adults charged with crimes and are awaiting competency evaluation or restoration at Larned, are represented in this action by their criminal defense attorney

or parent as "next friend." Plaintiffs are all currently sitting in county jails awaiting a bed at Larned. While in jail, they are not receiving comprehensive mental health care treatment; their criminal cases are stalled; and the symptoms of their mental illness will likely become exacerbated by the conditions in which they are forced to live.

6. As such, each Named Plaintiff represents scores of other Kansans who are either incompetent to stand trial or whose competency has been called into question, and who have been waiting in a Kansas county jail for months as the backlog of people needing services at Larned continues to grow. Named Plaintiffs are suing on behalf of over 100 people currently on the Larned wait list.

7. Larned is one of Kansas' two state psychiatric hospitals, and the only one to operate a forensic unit dedicated to the evaluation and treatment of people who are facing criminal charges. KDADS' other state psychiatric hospital, Osawatomie State Hospital (OSH), does not have a forensic unit.

8. Under Kansas law, when an individual with mental illness is accused of a crime, they, their counsel, or the prosecuting attorney can request a determination of the person's competency to stand trial. *See* K.S.A. § 22-3302(1). If, upon that request or the judge's own knowledge and observation, the judge finds reason to believe the person is incompetent to stand trial, then the criminal proceedings will be suspended and a hearing will be conducted to determine their competency. *Id.* Individuals are not allowed to enter into a plea while they are subject to a competency determination order by the court.

9.     In advance of that hearing, the court can order psychiatric or psychological examination of the person. In most instances, the court will order that the person be committed to the state security hospital, Larned, for the examination.[1] *See* K.S.A. § 22-3302(3)(A) and (3)(A)(a).

10.     If, following the competency evaluation, the court determines that the person is not competent to stand trial, the court will order the person to "any appropriate state, county, private institution or facility" for competency restoration treatment. *See* K.S.A. § 22-3303(1). In practice, the court typically orders the person to the custody and control of Larned.

11.     Although K.S.A §§ 22-3302 and 22-3303 provide a process for competency evaluation and restoration, these statutes do not provide deadlines for how quickly competency evaluation and restoration must begin to take place.

12.     Currently, Larned's forensic evaluation and treatment unit, the State Security Program (hereinafter referred to as the "forensic unit") is operating at reduced capacity. Although there are 120 beds dedicated to this unit, Larned is only filling approximately sixty-five percent of those beds at a time because it has insufficient staff to cover shifts for the full unit.

13.     As a result, Kansans with mental illnesses wait for months for a bed at Larned to undergo a competency evaluation or receive restoration treatment services. From public records, the current waitlist for Larned is over eleven months long. This means that, in some instances, individuals are spending more time detained in jail awaiting competency evaluation and/or competency restoration treatment than they would have served in jail if they were convicted on their underlying charge(s) and given the maximum sentence.

---

[1] K.S.A. § 22-3302 uses the term, "examination." However, in practice an examination is referred to as a "competency evaluation." Therefore, throughout this complaint we will refer to the examination as a competency evaluation unless directly quoting the statute.

14.　　The current competency evaluation and restoration system is failing Kansans with mental illness who are charged with crimes. It is forcing people with serious mental illness to remain locked in cages in local county jails at great harm to their mental health and ability to stabilize enough to assist with their own defense. In doing so, current practices and wait times deprive Named Plaintiffs and those similarly situated of their constitutional rights to due process and to be free from cruel and unusual punishment. The lengthy wait times also violate the Kansas Constitution's requirement that justice be provided without delay, as criminal cases do not proceed while individuals are awaiting competency evaluations or restoration treatment. Current practices also deprive Named Plaintiffs and those similarly situated of their right as individuals with qualifying disabilities to receive services and programs in the most integrated setting appropriate to their needs, in violation of the Americans with Disabilities Act.

15.　　As such, Named Plaintiffs bring this action against Defendant Howard, in her official capacity, Defendant Dixon, in his official capacity, and Defendant Dipman, in her official capacity, under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment to the United States Constitution, under K.S.A. §§ 60-1701 and 60-1703 (declaratory relief) and K.S.A. §§ 60-901 and 60-902 (injunctive relief) for violations of §§ 1 and 18 of the Bill of Rights of the Constitution of the State of Kansas, and under 42 U.S.C. § 12132, for violations of Title II of the Americans with Disabilities Act.

## JURISDICTION AND VENUE

16.　　This civil rights action is brought under 42 U.S.C. § 1983 and 42 U.S.C. § 12132. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

17.　　This court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

18.     Venue is properly set within the United States District Court for the District of Kansas pursuant to 28 U.S.C. § 1391.

## PARTIES

19.     Named Plaintiffs are two public defenders, one private attorney, and a parent who represent their client(s) or adult child with mental illness as next friends pursuant to Fed. R. Civ. P. 17(c).

**Jessica Glendening**

20.     Jessica Glendening is a public defender employed by the State Board of Indigent Defense Services ("SBIDS"). In that capacity, she represents G.W., a 36-year-old Native American man currently incarcerated at the Shawnee County Department of Corrections. Ms. Glendening brings this lawsuit on behalf of G.W. as G.W.'s "next friend" pursuant to Fed. R. Civ. P. 17(c)(2).

21.     G.W. has been incarcerated at the Shawnee County Department of Corrections since April 19, 2021 on drug possession charges. Therefore, G.W. has been incarcerated for over 12 months and counting. If convicted, G.W. faces a maximum sentence of 32 months, but may face considerably less time if he is able to secure a favorable plea deal.

22.     On May 11, 2021, the Shawnee County District Court ordered that G.W. undergo a competency evaluation pursuant to K.S.A. § 22-3302. This was not the first time G.W. underwent a competency evaluation. Between 2019-2021, G.W. cycled in and out of custody and received several competency evaluations—the first of which was in 2019, conducted through the door of his cell at the jail because the jail did not have the staff to bring G.W. out into general population for his evaluation. Even at points when G.W. is able to regain competency, he has quickly decompensated again, leading him to need another evaluation.

23.    G.W.'s most recent competency evaluation was completed on May 29, 2021 by Dr. David Blakely, a community mental health provider. The court held a competency hearing on July 13, 2021. Following that hearing, on September 10, 2021, the court ordered that G.W. undergo competency restoration at Larned pursuant to K.S.A. § 22-3303. G.W. was subsequently placed on the waitlist for a bed at Larned. As of April 25, 2022, G.W. was #48 on the waitlist.

24.    G.W. remains incarcerated at Shawnee County Department of Corrections, where he receives insufficient mental health treatment services and is so acutely mentally ill that he is unable or unwilling to communicate with Ms. Glendening. He has previously been diagnosed with unspecified schizophrenia spectrum and other psychotic disorder, unspecified, and substance abuse disorder. He has refused multiple attorney visits. It is unclear whether G.W. is taking medication, but medication refusal is not uncommon in those suffering from mental illness, especially in untherapeutic carceral settings.

**Colin Shaw**

25.    Colin Shaw is a public defender employed by SBIDS. In that capacity, he represents C.B., a 30-year-old White man currently incarcerated at the Shawnee County Department of Corrections. Mr. Shaw brings this lawsuit on behalf of C.B. as C.B.'s "next friend" pursuant to Fed. R. Civ. P. 17(c)(2).

26.    C.B. has been incarcerated at the Shawnee County Department of Corrections since September 16, 2021 on a criminal threat charge. If convicted, C.B. faces a maximum sentence of seven months. Yet, C.B. has already been incarcerated for 8 months and counting, which is longer than the maximum sentence for the underlying charge.

27.    On September 24, 2021, the Shawnee County District Court ordered that C.B. undergo a competency evaluation pursuant to K.S.A. § 22-3302. Dr. David Blakely completed that

evaluation on October 21, 2021. The court held a competency hearing on November 10, 2021. Following that hearing, on January 12, 2022, the court ordered that C.B. undergo competency restoration at Larned pursuant to K.S.A. § 22-3303. C.B. was subsequently placed on the waitlist for a bed at Larned.

28.     C.B. remains incarcerated at Shawnee County Department of Corrections, where he is in the special housing unit, which holds all of the high-risk individuals. Earlier in his incarceration, C.B. was in solitary confinement and on suicide watch. The jail is extremely short-staffed and on information and belief, many detainees spend most of the day locked down in their cells—especially individuals with acute mental illness.

29.     According to his competency evaluation, C.B. had a psychotic disorder. His diagnosis was that he most likely had schizophrenia or possibly bipolar disorder. Further, he appeared to have been paranoid, to have fractured thoughts, and to exhibit paranoid delusions. C.B. suffers from delusions likely due to schizophrenia, so communication with his attorney has been difficult. Dr. Blakely noted that C.B. needed to be treated in a hospital until he can be stabilized and is apparently a danger to others.

30.     Mr. Shaw also represents N.K., a 59-year-old Black man currently incarcerated at the Shawnee County Detention Center. Mr. Shaw brings this lawsuit on behalf of N.K. as N.K.'s "next friend" pursuant to Fed. R. Civ. P. 17(c)(2).

31.     N.K. has been incarcerated at the Shawnee County Detention Center since November 13, 2021 on charges of aggravated assault, interference, criminal trespass, and disorderly conduct charges. If convicted, N.K. faces a maximum sentence of sixty months. N.K. has been incarcerated for six months and counting.

32.     On November 15, 2021, the Shawnee County District Court ordered that N.K. undergo a competency evaluation pursuant to K.S.A. § 22-3302. Dr. David Blakely completed that evaluation on approximately December 21, 2021. The court held a competency hearing on January 18, 2022. However, due to the decompensated state of his mental health, N.K. would not leave the jail for the competency hearing. Following that hearing, on January 18, 2022, the court verbally ordered that N.K. undergo a competency evaluation at Larned pursuant to K.S.A. § 22-3302. A written order followed on March 15, 2022. Despite, the fact that a competency evaluation was already conducted by Dr. Blakely, the court could not order N.K. to Larned for competency restoration treatment pursuant to K.S.A. § 22-3303 because a restoration order requires that the individual be physically present for the competency hearing. N.K. was subsequently placed on the waitlist for a bed at Larned. Summer Millard, a psychology intern, attempted to conduct another competency evaluation on April 28, 2022, but was unsuccessful as N.K. refused to participate.

33.     N.K. remains incarcerated at Shawnee County Detention Center, where he is in segregation. Reports from N.K.'s attorney indicate that N.K.'s cell has the overwhelming stench of fecal matter, he has chronic trouble keeping his clothes on, and he refuses to take medication that is offered to him.

**Audra Asher**

34.     Audra Asher is a private attorney employed by the Law Office of Donald E. Anderson II, LLC. In that capacity, she represents L.P., a 33-year-old White man currently incarcerated at the Russell County Jail. Ms. Asher brings this lawsuit on behalf of L.P. as L.P.'s "next friend" pursuant to Fed. R. Civ. P. 17(c)(2).

35.     L.P. has been incarcerated at the Russell County Jail since April 14, 2021 on drug charges and battery/interference with a law enforcement officer. If convicted on all charges, L.P.

will face an estimated maximum sentence of 76 months, with the misdemeanor sentences running concurrent to the felony sentences. L.P. has been incarcerated for over 12 months.

36.    During his incarceration, L.P. has picked up several new misdemeanor charges stemming from outbursts or behavior related to his mental illness.

37.    On May 18, 2021, the Russell County District Court ordered that L.P. undergo a competency evaluation pursuant to K.S.A. § 22-3302. Kathy Schafer, a community mental health provider, completed that evaluation on June 4, 2021. The court held a competency hearing on July 6, 2021. Following that hearing, on July 6, 2021, the court ordered that L.P. undergo competency restoration at Larned pursuant to K.S.A. § 22-3303. L.P. was subsequently placed on the waitlist for a bed at Larned. As of the end of April 2022, L.P. was #24 on the waitlist.

38.    L.P. remains incarcerated at Russell County Jail, where he has been in segregation, confined to his own cell. Upon information and belief, L.P. is in segregation as a result of symptoms of his mental illness which include combativeness and volatility. He spends limited time outside of his cell.

39.    L.P. has previously been diagnosed with unspecified schizophrenia spectrum and other psychotic disorder, substance use disorder, and antisocial personality traits. He displays instability when around other people and is unable to meet in person with his attorney because of the lack of secure, private attorney visitation space at the jail. Jail staff no longer permit L.P. to have paper in his cell because he previously flushed paper down the toilet, creating a clog. He receives insufficient mental health treatment services and is so severely mentally ill that he has very limited to no phone privileges because he keeps breaking the phone. As a result of his condition, the jail no longer brings him to court for his hearings.

**Laura Valachovic**

40.     Laura Valachovic is E.K.'s mother. E.K. is a 22-year-old White man currently incarcerated at the Douglas County Correctional Center. Ms. Valachovic brings this lawsuit on behalf of E.K. as E.K.'s "next friend" pursuant to Fed. R. Civ. P. 17(c)(2).

41.     E.K. has been incarcerated since April 1, 2021, and has been housed at the Douglas County Correctional Center since April 15, 2021 on harassment criminal threat charges. If convicted, E.K. faces a maximum sentence of 13 months, but it is likely that the sentence will be probation. E.K. has been incarcerated for 13 months and counting, which is longer than the maximum sentence for the underlying charge.

42.     In September 2021, the Douglas County District Court ordered that E.K. undergo a competency evaluation pursuant to K.S.A. § 22-3302. Sara Godinez at Bert Nash, a community mental health center, completed that evaluation on September 15, 2021. The court held a competency hearing on September 28, 2021. Following that hearing, on approximately October 19, 2021, the court ordered that E.K. undergo competency restoration at Larned pursuant to K.S.A. § 22-3303. E.K. was subsequently placed on the waitlist for a bed at Larned. As of late April, E.K. was approximately #75 on the waitlist.

43.     E.K. remains incarcerated at Douglas County Correctional Center, where he has been housed in either administrative segregation or the medical unit. During his time at the jail, E.K. has displayed paranoia, frequently experiences psychotic episodes, and has been taken to the hospital twice with seizures. Doctors think that the seizures are due to psychogenic polydipsia, an excessive consumption of water. In addition, despite being allowed to call, E.K. has refused to speak to his mother, Ms. Valachovic, since September 28, 2021, and has been generally non-cooperative with his prior defense attorneys. E.K. fired his original defense attorney because he

had delusional beliefs that the attorney was working with the prosecutor. Ms. Valachovic believes that E.K.'s unwillingness to speak with her and his behavior towards his attorneys is a result of his continuously deteriorating mental health.

**Defendants**

44.     Defendant Laura Howard is the Secretary of KDADS. Pursuant to K.S.A. § 76-1305, "The secretary for aging and disability services is authorized and directed to establish, equip and maintain, in connection with and as part of the Larned [S]tate [H]ospital, suitable buildings to be known as the 'state security hospital' for the purpose of holding in custody, examining, treating and caring for such mentally ill persons as may be committed or ordered to the state security hospital by courts of criminal jurisdiction . . . The secretary for aging and disability services is hereby authorized and empowered to supervise and manage the state security hospital . . .'" K.S.A. § 76-1305. Secretary Howard is sued in her official capacity.

45.     Defendant Mike Dixon is the State Hospitals Commissioner. As State Hospitals Commissioner, Mr. Dixon is responsible for providing leadership, direction, oversight, and support to the state hospitals, which include Larned and OSH.[2]  Further, as the State Hospitals Commissioner, Mr. Dixon provides daily management and collaborates with the superintendents and executive staff at state hospitals, ensuring compliance with the conditions of participation for specific certification and accreditation.[3] He is sued in his official capacity.

---

[2] *State Hospitals*, KAN. DEP'T FOR DISABILITY AND AGING SERVS., https://kdads.ks.gov/about-kdads/commissions/state-hospitals.

[3] *See id.*

46.      Defendant Lesia Dipman is the Larned Superintendent. As Larned Superintendent, Ms. Dipman is responsible for the daily management, general operations, and oversight of Larned. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

**KDADS' Authority to Provide Competency Evaluations and Restoration Treatment**

47.      KDADS is a Kansas state agency, and it is the second largest agency in the Kansas government in terms of budget and number of employees.[4]

48.      KDADS manages four state hospitals and institutions, including Larned and OSH; administers behavioral health, addiction, and prevention programs; and administers the state's home- and community-based services waiver programs under KanCare, the state's Medicaid program.[5]

49.      The Secretary of KDADS oversees the State Hospital Commission, which is responsible for providing leadership, direction, oversight, and training to the state hospitals, including Larned.[6] The Commission provides for the daily oversight of Larned and works with superintendents and executive staff at all state hospitals, thereby ensuring compliance with conditions for certification and accreditation.[7]

50.      KDADS and the State Hospital Commission are responsible for the supervision and management of Larned.

---

[4] *History and Purpose*, KAN. DEP'T FOR DISABILITY AND AGING SERVS., https://kdads.ks.gov/about-kdads.

[5] *Id.*

[6] *State Hospitals*, KAN. DEP'T FOR DISABILITY AND AGING SERVS., https://kdads.ks.gov/about-kdads/commissions/state-hospitals.

[7] *Id.*

51.    Larned is the only state security hospital in Kansas with a forensic unit meant to house individuals who are either charged with crimes, or who have been found not guilty by reason of insanity.

52.    KDADS has an obligation to provide care and treatment to individuals ordered by state courts to undergo evaluation and/or treatment pursuant to K.S.A. §§ 22-3302 and 22-3303.

**Process for Competency Evaluations and Restoration Treatment**

53.    K.S.A. § 22-3302 provides the process for competency evaluations for people facing criminal charges.[8] It allows the defendant, their counsel, or the prosecuting attorney to request a competency determination of the defendant to stand trial. *See* K.S.A. § 22-3302(1).

54.    If a competency determination is requested, the defendant's criminal proceedings are suspended and a hearing will be conducted to determine the defendant's competency. *See* K.S.A. § 22-3302(1).

55.    As part of the determination, the court can order a psychiatric or psychological examination of the defendant and can commit the defendant to the state security hospital, which is Larned. *See* K.S.A. § 22-3302. However, K.S.A. § 22-3302 does not provide a deadline for how quickly a person must be transferred to Larned to begin the examination process after an evaluation is ordered by the court.

56.    In some counties, qualified mental health providers conduct competency evaluations pursuant to K.S.A. § 22-3302 at the jail. KDADS contracts with these providers for evaluation services. On information and belief, in counties where mental health providers are able

---

[8] The Kansas Legislature recently enacted several changes to K.S.A. §§ 22-3302 and 3303, via H.B. 2508, which was signed into law on April 18, 2022. *See* H.B. 2508, Kan. Legislature, 2021-2022 Session, http://www.kslegislature.org/li/b2021_22/measures/hb2508/. These changes go into effect on July 1, 2022. As noted below, *see infra* ¶¶ 99-101, it is unclear whether and when the statutory revisions will result in any changes to current processes and wait times.

to come into the jail to provide competency evaluations, people wait significantly less time for services than they would if they needed to be transferred to Larned for the evaluation.

57.    KDADS has also begun implementing a pilot program wherein KDADS employees operate mobile forensic evaluation units which provide competency evaluations at the county jail or in the community for those who are released pre-trial on bond. The pilot program for competency evaluations is currently operational in 21 counties.

58.    Regardless of whether the evaluation is performed at Larned, through a mobile evaluation unit, or by a community mental health provider at the jail, the results of the evaluation are used by the court in a formal hearing to determine if the person is competent to stand trial, or if treatment is needed before the person can stand trial, consistent with due process.

59.    If, following the competency hearing, the court finds a person competent to stand trial, the suspended criminal proceedings will be resumed. K.S.A. § 22-3302.

60.    If the court finds the person is not currently competent to stand trial, the court will proceed in accordance with K.S.A. § 22-3303, which provides the process for competency restoration for criminal defendants.

61.    However, like K.S.A. § 22-3302, this statute does not require that competency restoration treatment begin within a set time following the court's commitment order. As a result, people wait for months, if not years, for placement at Larned pursuant to competency restoration orders.

62.    Upon information and belief, KDADS could provide competency restoration treatment for some individuals in other facilities besides Larned. However, the vast majority of people needing restoration treatment are simply put on the wait list for a bed at Larned and other options are not utilized.

63.    KDADS has also recently begun a pilot program for mobile competency restoration services at approximately three county jails. In those counties, Larned provider(s) attempt to provide competency restoration required under K.S.A. § 22-3303 without needing to commit individuals to beds at Larned. The pilot program is currently limited, and its efficacy is unknown.

**Reduced Capacity in Larned's Forensic Unit**

64.    Larned has been limiting admissions to the hospital, and the forensic unit in particular, for over a year.

65.    There are 120 beds in the forensic unit. However, during the COVID-19 pandemic, KDADS reduced the available beds to 78 total (58 for males and 20 for females). Current capacity of the forensic unit remains between 75 and 78.[9]

66.    In 2021, the Governor's Budget Association restored funding for 30 forensic beds. However, Larned is not able to fill positions to staff the unit, and there are high staff vacancy rates.[10]

67.    As of February 2022, the staff vacancy rates are 47.8 percent for direct care staff or the Mental Health Disability Technicians, 54.3 percent for Registered Nurses in the forensic program, and 75.6 percent for Licensed Practical Nurses.[11] According, to KDADS Deputy

---

[9] Scott Brunner, Deputy Secretary for Hospitals & Facilities KDADS, *Proponent Testimony HB 2697 – concerning crimes, punishment and criminal procedure; relating to competency to stand trial; mobile competency evaluations*, Feb. 17, 2022, http://www.kslegislature.org/li/b2021_22/committees/ctte_h_jud_1/misc_documents/download_testimony/ctte_h_jud_1_20220217_12_testimony.html.

[10] *Id.*

[11] *Id.*

Secretary Scott Brunner, the unit with the 30 forensic beds cannot safely open until the nursing department vacancy rate is approximately 20 to 25 percent for these positions.[12]

68.     The staff capacity reductions of the forensic unit at Larned have increased the number of individuals that are waiting for treatment and the amount of time spent waiting.[13]

**KDADS' Wait List**

69.     KDADS has a waitlist for beds at Larned for those in need of competency evaluations or restoration treatment. Each Named Plaintiff is presently on the waitlist.

70.     Between January 2020 and December 2021, the number of individuals waiting for treatment at Larned increased from 118 to 167.[14]

71.     Between July 2020 and December 2021, the time spent waiting for admission into Larned increased from 270 to 336 days.[15]

72.     As of January 2022, the waitlist for K.S.A. §§ 22-3302 and 3303 included people from 33 counties.

73.     As of January 2022, Sedgwick County had 28 people on the waitlist, and Shawnee County had 18 people on the waitlist.

74.     According to KDADS, the current expected wait time for individuals to receive a competency evaluation and/or competency restoration treatment at Larned is 11 months.

---

[12] *Id.*

[13] *See id.*

[14] Scott Brunner, Deputy Secretary for Hospitals & Facilities KDADS, *Proponent Testimony HB 2697 – concerning crimes, punishment and criminal procedure; relating to competency to stand trial; mobile competency evaluations*, Feb. 17, 2022, http://www.kslegislature.org/li/b2021_22/committees/ctte_h_jud_1/misc_documents/download_testimony/ctte_h_jud_1_20220217_12_testimony.html.

[15] *Id.*

75.     As of the afternoon of January 27, 2022, individuals awaiting competency evaluations at Larned pursuant to K.S.A. § 22-3302 had been on the waitlist for an average of 133 days.[16]

76.     As of the afternoon of January 27, 2022, individuals awaiting competency restoration treatment at Larned pursuant to K.S.A. § 22-3303 had been on the waitlist for an average of 151.9 days.

77.     The graph below demonstrates how long individuals have been waiting for a bed at Larned pursuant to K.S.A. § 22-3302 or § 22-3303, in 30-day increments, as of January 27, 2022. As demonstrated by this graph, the vast majority of those waiting for a bed at Larned under K.S.A. § 22-3302 or § 22-3303 have waited longer than 30 days, and there are many more people waiting for a bed for a longer period of time under K.S.A. § 22-3303.

_____

[16] The average wait times noted in this paragraph and the subsequent paragraph are based on an analysis of the wait list provided by KDADS in response to a Kansas Open Records Act Request filed by the ACLU of Kansas. One outlier—an individual awaiting transfer to Larned for over 800 days—was excluded from the analysis, as were all individuals who were currently bonded out of jail and awaiting their evaluations or treatment in non-carceral settings.



78.     Importantly, some individuals on the current waitlist for Larned are facing only misdemeanor charges. Sentences for misdemeanor convictions, by law, result in a sentence of no more than 12 months of incarceration in jail. K.S.A. § 21-6602(a).

79.     Many others are facing low-level felony charges, which by statute would result in a sentence of no more than 18 months of incarceration.

80.     Yet, due to the current wait times of 11 months for bed space at Larned, Named Plaintiffs and those similarly situated may spend almost the same amount of time or more in jail waiting to be transferred to Larned as they would if they were convicted on their underlying charge(s). This means that, because of KDADS' failures, people with serious mental illness are serving sentences well beyond what is statutorily authorized.

81.     The problems at Larned are well known to KDADS. In 2020, the Kansas Supreme Court's Ad Hoc Pretrial Justice Task Force found that, "[i]t is reported as not unusual (during normal times) for a person to spend more time waiting to go to Larned than the entire sentence the

defendant would have been given if the defendant had pled guilty, which is something they are not permitted to do until the competency evaluation is completed at Larned."[17]

82.    The charts below demonstrate how many people were on the waitlist for bed space at Larned as of January 27, 2022, broken down by their underlying charges and whether the person was ordered to undergo an evaluation under K.S.A. § 22-3302, or to receive restoration treatment under K.S.A. § 22-3303.



83.    The graph below demonstrates how many days, on average, people on the waitlist had been waiting for a bed at Larned, broken down by charge type, as of January 27, 2022.

---

[17] *Pretrial Justice Task Force Report to the Kansas Supreme Court* at 31, Kan. Judicial Branch, Nov. 6, 2020 (footnotes omitted).



**Conditions of incarceration while awaiting placement at Larned**

84.    When a judge orders an individual to undergo a competency evaluation or treatment, they are left to wait in local county jails until Larned has a bed available. This places the burden on county jail administrators and personnel to meet the mental health needs of these individuals, including Named Plaintiffs.

85.    Often, county jails are not sufficiently resourced, equipped, or trained to provide services for individuals with serious mental illness.[18]

86.    Jail conditions can further exacerbate mental illness, even if the person is not subjected to prolonged solitary confinement. Kansas county jails, like many jails throughout the

---

[18] Performance Audit Report, *Community Mental Health: Evaluating Mental Health Services in Local Jails* at 1, 29, Legislative Division of Post Audit, Legislature of Kansas, Apr. 2018, https://www.kslpa.org/wp-content/uploads/2019/07/1-Final-Report.pdf ("A recent survey indicates many jails are not equipped to address the needs of individuals with mental health needs held in those jails;" "The 96 jails across the state are ultimately responsible for inmates' mental health needs while in jail, but jail staff do not have the expertise to provide necessary services.").

United States, are overcrowded,[19] which exacerbates the harms of the carceral environment for those with mental illness.[20] Further, "[o]vercrowding often means more time in cell, less privacy, less access to mental and physical healthcare, and fewer opportunities to participate in programming."[21]

87.    Long stays in county jails, "can trigger and worsen symptoms of mental illness – and those effects can last long after someone leaves the prison gates."[22]

88.    Jails, including those throughout the State of Kansas, can be violent environments[23] and exposure to violence in "jails can exacerbate existing mental health disorders or even lead to the development of post-traumatic stress symptoms like anxiety, depression, avoidance,

---

[19]*Kansas jail looks at modular units to deal with overcrowding*, Assoc. Press, Nov. 27, 2017, https://apnews.com/article/6e0100481d044b5da2ea304d2356e92d; KAKE.com, *Sheriff: Sedgwick County jail is facing overcapacity*, Jan. 18, 2020; KSN News, *Overcrowding at the jail: A growing problem during the pandemic*, KSN.com, Aug. 12, 2020, https://www.ksn.com/news/health/coronavirus/coronavirus-in-kansas/overcrowding-at-the-jail-a-growing-problem-during-the-pandemic/.

[20] Katie Rose Quandt and Alexi Jones, *Research Roundup: Incarceration can cause lasting damage to mental health*, Prison Policy Initiative, May 13, 2021, https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/.

[21] *Id.*

[22] *Id.*

[23] *See* Compl., *Carter v. Hutchinson Police Dep't et al.*, No. 22-cv-03004 (D. Kan. Jan. 5, 2022), ECF No. 1 (plaintiff alleges he was severely injured when he was placed in a restraint chair at Reno County Jail while he was in the throes of a seizure); Compl., *Moon v. Stineman et al.*, No. 21-cv-01027 (D. Kan. Jan. 28, 2021), ECF. No. 1 (plaintiff alleges a guard at Sedgwick County Jail beat him while his hands and feet were shackled); Compl., *Beachy v. Reno Cty. Corr. Facility et al.*, No. 16-cv-03138 (D. Kan. June 27, 2016), ECF No. 1 (plaintiff alleges he was beaten so severely by fellow inmates at Reno County Jail that he had to be airlifted to a hospital for life saving treatment); *see also* Alison Kite, *For-profit Kansas prison an understaffed 'hell hole of violence, death and drugs,* Kan. Reflector Oct. 7, 2021, https://kansasreflector.com/2021/10/07/for-profit-kansas-prison-an-understaffed-hell-hole-of-violence-death-and-drugs/ (describing well-documented violence in Leavenworth Detention Center).

hypersensitivity, hypervigilance, suicidality, flashbacks, and difficulty with emotional regulation."[24]

89.     Individuals with serious mental illness may be difficult to control, violent, compulsive, or otherwise pose a threat to themselves or others while in jail.[25] As a result, jail personnel often resort to confining individuals with serious mental illness in isolation or solitary confinement, away from the general population, until a bed becomes available at Larned.[26]

90.     However, "[t]he adverse effects of solitary confinement are especially significant for persons with serious mental illness, commonly defined as a major mental disorder (e.g., schizophrenia, bipolar disorder, major depressive disorder) that is usually characterized by psychotic symptoms and/or significant functional impairments. The stress, lack of meaningful social contact, and unstructured days can exacerbate symptoms of illness or provoke recurrence .

---

[24] Katie Rose Quandt and Alexi Jones, *Research Roundup: Incarceration can cause lasting damage to mental health*, Prison Policy Initiative, May 13, 2021, https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/.

[25] Patrick Miller, *Kansas prison crisis is also a mental health crisis*, Insight Kansas, Oct. 25, 2019, (noting "mentally ill offenders are more likely to receive extended sentences and other punishments in prison due to behavioral incidents"); *see also* Shawnee County Department of Corrections Adult Detention Center, Inmate Handbook at 36 (March 2019), https://snwebresources.blob.core.windows.net/corrections/document/policies-and-procedures/adult-detention-center/inmate_handbook_and_grievance_procedures.pdf (inmates can be placed in segregation for disciplinary purposes or if they are considered a security risk).

[26] *See* Second Am. Compl., *Scriven v. Sedgwick Cty. Comm'rs, Bd.of et al.*, No. 20-cv-03110 (D. Kan. Nov. 30, 2021), ECF No. 79 (plaintiff with physical disabilities and a traumatic brain injury alleges he was placed on lockdown at Sedgwick County Jail for four days as punishment for asking to get undressed in his ADA-compliant cell instead of where he was directed); Am. Compl., *Guebara v. Bascue et al.*, No. 19-cv-03025 (D. Kan. Aug. 26, 2019), ECF No. 11 (plaintiff alleges he was placed on lockdown for months at El Dorado Correctional Facility as punishment for requesting medical treatment, causing his health to deteriorate and leading him to attempt suicide); *see also* Noah Taborda, *As immigrant's health deteriorates in Seward County Jail, his wife pleads for mercy*, Kan. Reflector, Mar. 28, 2021, (explaining that after an inmate with mental health issues was transferred to solitary confinement, "his mental health began to deteriorate…[and] he began to suffer from hallucinations and paranoia and began using concerning and suicidal language" before later attempting suicide).

. . All too frequently, mentally ill prisoners decompensate in isolation, requiring crisis care or psychiatric hospitalization. Many simply will not get better as long as they are isolated."[27]

91.    "Solitary confinement for people with serious mental illness: . . . [c]auses extreme suffering . . . [d]isrupts treatment . . . [c]auses or worsens symptoms such as depression, anxiety, and hallucinations . . . [i]mpedes rehabilitation, recovery, and community re-integration . . . [and] [c]auses adverse long-term consequences for cognitive and adaptive functioning."[28]

92.    People who are severely mentally ill and held in solitary confinement often deteriorate "dramatically."[29] And "[t]he damaging effects of solitary confinement on people with mental illness are exacerbated because these prisoners often do not receive meaningful treatment for their illnesses."[30]

93.    "The shattering impacts of solitary confinement are so well-documented that nearly every federal court to consider the question has ruled that placing people with severe mental illness in such conditions is cruel and unusual punishment in violation of the U.S. Constitution,"[31] "and the United States Department of Justice has found that the practice violates both the federal Constitution and federal statutory law."[32]

---

[27] Jefferey L. Metzner and Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for [sic] Medical Ethics*, 38 J. AM. ACADEMY OF PSYCHIATRY AND THE LAW ONLINE 104 (Mar. 2010) http://jaapl.org/content/38/1/104, (footnote omitted).

[28] *Solitary Confinement*, National Alliance on Mental Illness, https://www.nami.org/Advocacy/Policy-Priorities/Stopping-Harmful-Practices/Solitary-Confinement.

[29] Am. Civil Liberties Union, *Briefing Paper: The Dangerous Overuse of Solitary Confinement in the United States*, 6 (Aug. 2014), https://www.aclu.org/other/stop-solitary-briefing-paper?redirect=criminal-law-reform-prisoners-rights/stop-solitary-briefing-paper.

[30] *Id.* at 7.

[31] *Id.*

[32] *Id.*

94. In addition, "in 2012, the American Psychiatric Association, the world's largest psychiatric organization and a leader in humane care and effective treatment, issued a formal position statement that prisoners with serious mental illness should almost never be subjected to such treatment and in the rare event that isolation is necessary, they must be given extra clinical supports."[33]

95. KDADS' failure to timely provide competency evaluations and competency restoration treatment results in Plaintiffs' confinement in jail, including prolonged periods of solitary confinement or segregation, where they do not receive necessary services and treatment.

**Concerns of Stakeholders**

96. Kansas sheriffs recognize that Larned's long waitlist for forensic beds is a significant issue in need of immediate resolution. On October 25, 2021, over 60 Kansas Sheriffs sent a letter to Governor Kelly expressing their concern about management and operations at Larned.[34] This letter cited issues with Larned's policies on who is admitted as well as how long it takes.[35] The signatories requested that KDADS make major changes to Larned's admission process.[36]

---

[33] *Id.*

[34] Jackson Overstreet, *61 Kansas sheriffs call for changes to Larned state hospital admin, process*, KAKE.com, Nov. 4, 2021, https://www.kake.com/story/45125959/61-kansas-sheriffs-call-for-changes-to-larned-state-hospital-admin-process.; KAKE News, *Kansas sheriffs send letter to governor asking for changes to KDADS, Larned State Hospital*, KAKE.com, Nov. 3, 2021, https://www.kake.com/story/45120737/kansas-sheriffs-send-letter-to-governor-asking-for-changes-to-kdads-larned-state-hospital.

[35] Jackson Overstreet, *61 Kansas sheriffs call for changes to Larned state hospital admin, process*, KAKE.com, Nov. 4, 2021, https://www.kake.com/story/45125959/61-kansas-sheriffs-call-for-changes-to-larned-state-hospital-admin-process.

[36] *See id.*

97.    The Kansas sheriffs wrote, "[i]t is our experience that the operations and management at Larned State Hospital have reached a crisis level."[37] They shared that "[a]lmost every law enforcement agency in Western Kansas continues to have problems with services at the state hospital."[38] And they further wrote, "[a]s Sheriffs, we understand issues concerning staffing and Covid 19 related problems. We are faced with the same issues every day in our county jails. That said, we will continue to do our job. Larned State Hospital must also."[39]

98.    An April 2018 Performance Audit Report stated, "Individuals may have trouble accessing services at the state's two mental health hospitals because of wait times and a lack of bed space. . . K.S.A. [§] 39-1602(h) requires community mental health centers to screen individuals to determine if they require treatment in a state mental health hospital. Some community mental health centers reported there can be significant wait times for admission to the state hospitals due to long wait lists and a lack of bed space. This means the community mental health center or the jail must potentially provide crisis management and stabilization services instead of an individual receiving the needed care at the state hospital."[40]

**The Impact of HB 2508**

99.    In the 2022 Legislative Session, KDADS championed reforms to K.S.A. §§ 22-3302 and 3303 to expand the number and type of facilities that could conduct competency

---

[37] KAKE News, *Kansas sheriffs send letter to governor asking for changes to KDADS, Larned State Hospital*, KAKE.com, Nov. 3, 2021, https://www.kake.com/story/45120737/kansas-sheriffs-send-letter-to-governor-asking-for-changes-to-kdads-larned-state-hospital.

[38] *Id.*

[39] *Id.*

[40] Performance Audit Report, *Community Mental Health: Evaluating Mental Health Services in Local Jails* 23, Legislative Division of Post Audit, Legislature of Kansas (Apr. 2018), https://www.kslpa.org/wp-content/uploads/2019/07/1-Final-Report.pdf.

evaluations and restoration treatment. Governor Kelly signed these reforms into law on April 18, 2022.[41]

100.     The implementation plans for the legislation remain unclear. Although the enacted legislation provides more options for competency evaluation and treatment, it is unclear what impact, if any, the reforms will have on wait times for beds at Larned.

101.     HB 2508 therefore represents a step in the right direction, but it is an incomplete solution to the unconstitutional wait times currently in place.

**Named Plaintiffs are Qualified Individuals with a Disability Under the Americans with Disabilities Act (ADA).**

102.     Plaintiffs are qualified individuals with a disability as defined under 42 U.S.C. § 12131. A qualified individual with a disability is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). "'[D]isability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment" (as later described in paragraph (3)). 42 U.S.C. § 12102. Individuals do not need a formal diagnosis to meet the definition of having a "disability" or to be a "qualified individual" under the ADA.

---

[41] *See* House Bill 2508 (eff. July 1, 2022), available at
http://www.kslegislature.org/li/b2021_22/measures/documents/hb2508_enrolled.pdf.

103.    The ADA regulations mandate that a public entity administer services and programs "in the most integrated setting appropriate to the needs of the qualified individuals with disabilities." 28 CFR § 35.130(d).

104.    The ADA regulations mandate that a public entity "make reasonable modifications in policies, practices, or procedures when" they "are necessary to avoid discrimination on the basis of disability, unless the" entity can demonstrate making these "modifications would fundamentally alter the nature of the service, program, or activity." 28 CFR § 35.130(b)(7)(i).

105.    The Supreme Court of the United States addressed Title II ADA in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999). The question before the Supreme Court was "whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions." *Id*. The Supreme Court held a qualified yes in response to this question: "under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 587, 607.

106.    Under *Olmstead*, the integration regulation forbids unjustified isolation of the disabled. *Olmstead* at 597; *see also* 28 CFR §35.130(d). The unnecessary isolation is a form of illegal discrimination against the disabled.

107.    Here, Named Plaintiffs are qualified individuals with a disability as they are individuals living with a mental impairment and/or serious mental illness that substantially limits one or more of their major life activities. Each Named Plaintiff is impaired, by way of their mental illness, in a manner that substantially limits their ability to engage in major life activities. All

Plaintiffs are unable to substantially care for themselves, including maintaining proper hygiene, prosocial behavior, or otherwise manage their interactions with others. Many are non-communicative with jail staff and their attorneys.

108.    KDADS is a public entity that must comply with the ADA and its regulations, including the integration mandate and the fundamental-alteration regulation. *See* 28 CFR § 35.130(b)(7)(i).

## CLASS ACTION ALLEGATIONS

109.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1)(A), the individually named Plaintiffs bring this action on behalf of the individuals they represent as next friends, and all other persons similarly situated as members of the proposed class. Plaintiffs seek declaratory and injunctive relief against the Defendants on behalf of the class.

110.    This action satisfies the numerosity, commonality, typicality, and fairness and adequacy elements of Federal Rule of Civil Procedure 23(a).

111.    Plaintiffs bring this action on behalf of a class of persons detained pretrial and court ordered to undergo a competency evaluation and/or competency restoration treatment pursuant to K.S.A. § 22-3302 and/or K.S.A. § 22-3303, who are awaiting transfer to Larned pursuant to those court orders.

112.    Plaintiffs reserve the right to amend the class definition if discovery or further investigation reveals that the class should be expanded, divided into subclasses, or modified in any way.

**Numerosity**

113.    The proposed class is sufficiently numerous as there are approximately 137 individuals in the proposed class based on the waitlist as of the afternoon of January 27, 2022.

114.    These numbers are ascertainable as KDADS maintains a frequently-updated waitlist. The numbers are regularly changing as more individuals are added to or dropped from the waitlist, which further supports the need for class certification to account for the many and regularly changing members of the class.

115.    The proposed class is numerous to the extent that joinder is impracticable as attempting to join approximately 137 cases from various counties across the state of Kansas would not be convenient or reasonable.

116.    The waitlist includes people incarcerated in local jails across the entire state of Kansas, and consists of people incarcerated in several counties, thereby weighing in favor of numerosity.

117.    Further, the ability for individuals to bring lawsuits on this subject matter claiming constitutional violations may be very limited as a number of proposed class members may be indigent to the extent that it would not be financially feasible to bring such a lawsuit.

**Commonality**

118.    In this action, there are common questions of law, including whether it is a substantive due process violation to confine individuals in jail for unreasonable lengths of time when awaiting competency services or restoration treatment and whether it is an *Olmstead* violation to not provide community-based treatment under the circumstances of unreasonably long wait times.

119.    Additionally, there are questions of fact regarding each of our claims for the court to determine which are common to all class members. These include the length of time spent on the waitlist; the availability of alternative programs to reduce wait times; the reasons why wait times for forensic bedspace at Larned are so long; and more.

**Typicality**

120.    Proposed class representatives, as next friend representatives, are part of the class and have the same interest as their class members. First, proposed class representatives have the same interest as their class members in not waiting unconstitutional lengths of time to receive either a competency evaluation, and/or competency restoration treatment. Second, proposed class representatives have the same interest as their class members in terms of their liberty interest in freedom from incarceration and in terms of their liberty interests in restorative treatment for those awaiting competency restoration treatment. Third, proposed class representatives have the same interest as their class members in being free from cruel and unusual punishment. Lastly, class representatives have the same interest as their respective class members in community-based treatment for those awaiting competency restoration treatment, if available.

121.    Proposed class representatives suffer the same injury—extensive confinement, infringement on constitutional rights, and impact to their mental health.

**Fairness and adequacy**

122.    There would be no conflicts of interest between the named plaintiffs and other class members, and we would pursue this action vigorously on behalf of the whole class.

**Rule 23(b)(1)(A)**

123.    Bringing separate actions by individual class members would create a risk of inconsistent or varying adjudication regarding individual class members. Different district court judges could rule differently regarding the constitutionality of wait times resulting in contradictory standards on the question as to whether the wait times are reasonable and what amount of time would be deemed acceptable.

124.    Further, different district court judges could view any of the multiple claims differently resulting in varying conclusions on questions of constitutional law.

31

**Rule 23(b)(2)**

125.    Defendants have not acted to get rid of the unreasonably long wait times that harm both classes. Defendants have also not fulfilled their statutory obligations to provide competency evaluations or restoration treatment to the class. Defendants have also failed to fulfill their statutory obligations to provide mental health services and/or treatment in the most integrated setting appropriate as to the needs of all of the Plaintiffs and others similarly situated within the class. The necessary remedy is thus declaratory and injunctive relief to prevent further injury to the class.

126.    Class members have the same injuries. Plaintiffs have suffered common injuries of extensive confinement, infringement on their constitutional rights (substantive and procedural due process, cruel and unusual punishment, and state constitutional due process), and impact on their mental health, and evidence will demonstrate Defendants' inactions and actions regarding the wait times which created these injuries.

127.    Further, relief would not need to be tailored to each class member as the same declaratory and injunctive relief related to wait times for competency evaluations and restoration treatment would provide relief to the entire class.

## CLAIMS FOR RELIEF

### COUNT 1
### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION—THE RIGHT TO SUBSTANTIVE DUE PROCESS

**(Claims of Plaintiffs and others similarly situated Pursuant to 42 U.S.C. § 1983 Against Defendants for Violations of the Fourteenth Amendment)**

128.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated herein.

129.    The Due Process Clause of the Fourteenth Amendment requires the nature and duration of an individual's involuntary confinement bear a reasonable relation to the purpose for which the individual is committed.

130.    Plaintiffs awaiting competency evaluations have a liberty interest in freedom from incarceration and a liberty interest in their cases expeditiously proceeding to trial.

131.    Plaintiffs awaiting competency restoration have a liberty interest in freedom from incarceration, a liberty interest in restorative treatment, and a liberty interest in their cases expeditiously proceeding to trial. Individuals that have been found unable to aid and assist in their own defense have a constitutional right to individualized treatment to give them a realistic opportunity to be restored to competency or to improve their mental condition.

132.    No legitimate state interest justifies the confinement of mentally incompetent individuals in county jails for months. The current duration of Plaintiffs' confinement (potentially 11 months awaiting competency evaluation or competency restoration treatment) is not reasonably related to the purpose of their current confinement. The purpose of Plaintiffs' confinement is to either determine whether or not they are competent to stand trial or to restore their competency in order for them to stand trial. Because Plaintiffs are not receiving a competency evaluation or any competency restoration treatment during these long wait times, the duration of their confinement is unrelated to the purpose of their confinement.

133.    Once an individual has been found to be unable to aid and assist in their own defense, the only lawful purpose regarding confinement is to treat the individual in order to restore their competency.

134.    County jails in Kansas do not have capacity or resources to provide restorative mental health treatment as required by the United States Constitution and Kansas law.

135.    Defendants, through KDADS, failed and continue to fail their duty to provide competency evaluations and competency restoration treatment for those committed to the custody of KDADS in a constitutionally timely manner.[42]

136.    Defendants, through KDADS, have violated Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment.

137.    Unless enjoined, Defendants will continue to violate the constitutional rights of Plaintiffs and others similarly situated.

## COUNT 2
## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT—THE RIGHT TO NOT BE DENIED ACCESS TO COMMUNITY-BASED TREATMENT

**(Claims of Plaintiffs and others similarly situated Pursuant to 42 U.S.C. § 12132 Against Defendants for Violations of Title II of the Americans with Disabilities Act)**

138.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated herein.

139.    Plaintiffs that have been ordered to receive a competency evaluation need and require mental health evaluation services so that their court cases may proceed without delay.

140.    Plaintiffs that have been ordered to undergo competency restoration treatment need and require mental health treatment so that they can be restored to competency and have their court cases proceed without delay.

141.    Plaintiffs are qualified individuals with a disability as defined under 42 U.S.C. § 12131, as they suffer from mental illness severe enough that their competency to stand trial has been called into question, or they have already been deemed incompetent to stand trial.

---

[42] In a similar case, *Oregon Advocacy Center v. Mink*, the court upheld "the district court's injunction requiring OSH [Oregon State Hospital] to admit mentally incapacitated criminal defendants within seven days of a judicial finding of incapacitation." 322 F.3d 1101, 1105, 1123 (9th Cir. 2003).

142.    "[U]nder Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead*, 527 U.S. at 607.

143.    Under 28 CFR § 35.130(b)(7)(i), "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

144.    Under 28 CFR § 35.130(d), "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR § 35.130(d).

145.    Under *Olmstead*, the integration regulation forbids unjustified isolation of individuals with disabilities. 527 U.S. at 597. The unnecessary isolation is a form of illegal discrimination against the disabled. *Id.*

146.    For long periods of time, Defendants have denied and continue to deny Plaintiffs the mental health services and/or treatment Plaintiffs are qualified to receive.

147.    The lengthy wait times for forensic bedspace at Larned imperil Plaintiffs and risk unjustified isolation in jails. This unjustified isolation in jails excludes Plaintiffs from participation in and the benefits of services, programs, or activities meant to support individuals with severe mental illness in violation of the ADA.

148.    By failing to timely transfer Plaintiffs and those similarly situated to forensic beds at Larned, Defendants have neglected their duty to provide the necessary and required mental

health service and treatment under the ADA, and they continue to fail to comply with the integration regulation under the ADA regulations.

149.    Further, Defendants have not provided mental health treatment in a community-based setting where it would be appropriate to all Plaintiffs and others similarly situated nor have Defendants provided mental health services and/or treatment in the most integrated setting appropriate as to the needs of all of the Plaintiffs and others similarly situated.

150.    Financial and administrative burdens are not an excuse for Plaintiffs' displacement in county jails across Kansas. *See Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175, 1182 (10th Cir. 2003) (stating "[the] *Olmstead* Court rejected a construction of the fundamental-alteration defense that required *only* a comparison of the cost of the community services for the plaintiffs with the state's budget."). The *Fisher* Court established that public entities may not cite only a financial crisis as a fundamental-alteration defense. *Id.*

151.    Defendant Howard, in her direction, supervision, and control of KDADS, has failed to provide or cause to be provided through KDADS, reasonable accommodation of Plaintiffs' disabilities with access to integrated community-based treatment alternatives.

152.    Defendants, through KDADS, have failed and continue to fail to provide community-based competency restoration treatment for Plaintiffs under Title II of the ADA.

153.    Unless enjoined, Defendants will continue to violate the ADA rights of Plaintiffs and others similarly situated.

## COUNT 3
## VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION—THE RIGHT TO PROCEDURAL DUE PROCESS

**(Claims of Plaintiffs and others similarly situated Pursuant to 42 U.S.C. § 1983 Against Defendants for Violations of the Fourteenth Amendment)**

154.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated herein.

155.    The Due Process Clause of the Fourteenth Amendment requires due process of law before depriving an individual of life, liberty, or property.

156.    Plaintiffs awaiting competency evaluation have a liberty interest in freedom from incarceration and a liberty interest in their cases expeditiously proceeding to trial.

157.    Plaintiffs awaiting competency restoration have a liberty interest in freedom from incarceration, a liberty interest in restorative treatment, and a liberty interest in their cases expeditiously proceeding to trial.

158.    Plaintiffs' respective constitutional rights and liberty interests in freedom from incarceration, liberty interests in their cases expeditiously proceeding to trial, and liberty interests in restorative treatment are violated when detained pretrial with no progress toward trial due to long wait times to receive necessary and required mental health services and/or treatment, which are essential to their ability to proceed to trial and to aid and assist in their own defense.

159.    The lengthy confinement amounts to punishment as Plaintiffs suffer in jail without access to proper and court-ordered mental health services and treatment and is a violation of their liberty interest in freedom from incarceration without due process of law.

160.    The lengthy confinement amounts to further punishment in instances where an individual has been or will be incarcerated for longer than they would be confined if/when sentenced on the underlying charge(s) due to the long wait times and is a violation of their liberty interest in freedom from incarceration without due process of law.

161.    The length of time without access to restorative treatment amounts to a violation of their liberty interest in restorative treatment without due process of law.

162.    Named Plaintiffs have been and continue to be confined while awaiting competency evaluation and/or competency restoration for long periods of time resulting in deprivation of their

rights to liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment.

163.    Defendants, through KDADS, failed and continue to fail to provide competency evaluations and competency restoration treatment for those committed to the custody of KDADS in a constitutionally timely manner, such that current wait times amount to punishment and the deprivation of the right to restorative treatment.

164.    Defendants, through KDADS, administer KDADS, the State Hospital Commission, and Larned State Hospital, in a way that results in prolonged wait times for competency evaluations and restoration treatment, which violates Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment.

165.    Unless enjoined, Defendants will continue to violate the constitutional rights of Plaintiffs and others similarly situated.

## COUNT 4
## VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION—THE RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT

### (Claims of Plaintiffs and others similarly situated Pursuant to 42 U.S.C. § 1983 Against Defendants for Violations of the Fourteenth Amendment)

166.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated herein.

167.    Plaintiffs are pretrial detainees who have not yet been convicted of the crimes with which they are charged.

168.    Plaintiffs ordered to undergo competency evaluation need and require mental health services.

169.    Plaintiffs ordered to undergo competency restoration treatment need and require mental health services and treatment.

170.    Individuals found incompetent have a right to individualized treatment to give them a realistic opportunity to be restored to competency.

171.    Kansas county jails do not have capacity or ability to provide proper competency restoration treatment required by the United States Constitution.

172.    Kansas county jails do not provide proper competency restoration treatment.

173.    Named Plaintiffs have been and continue to be confined awaiting competency evaluation and/or competency restoration for long periods of time in violation of their rights under the Due Process Clause of the Fourteenth Amendment.

174.    It is cruel and unusual to detain Plaintiffs for an unreasonable and/or indefinite period of time while awaiting a competency evaluation and/or competency restoration treatment in violation of the Due Process Clause of the Fourteenth Amendment.

175.    It is cruel and unusual to detain Plaintiffs for longer than they would serve if convicted for the crimes that they have been charged with and detained for, in violation of the Due Process Clause of the Fourteenth Amendment.

176.    Defendants, through KDADS, maintained and continue to maintain unreasonably long wait times for competency evaluations and competency restoration treatment for Plaintiffs to be transferred to Larned, and fail to provide community based alternatives for evaluations and treatment that would allow for the faster provision of these necessary and statutorily mandated services.

177.    Defendants, through KDADS, failed and continue to fail their duty to provide competency evaluations and competency restoration treatment for those committed to the custody of KDADS, violating Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment.

178.     Unless enjoined, Defendants will continue to violate the constitutional rights of Plaintiffs and others similarly situated.

**COUNT 5**
**VIOLATION OF SECTIONS 1 AND 18 OF THE CONSTITUTION OF THE STATE OF KANSAS—THE RIGHT TO DUE PROCESS**

**(Claims of Plaintiffs and others similarly situated Pursuant to K.S.A. §§ 60-1701 and 60-1703, 60-901, and 60-902 Against Defendants for Violations of §§ 1 and 18 of the Bill of Rights of the Constitution of the State of Kansas)**

179.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated herein.

180.     Section 1 of the Bill of Rights of the Constitution of the State of Kansas states "all men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

181.     Section 18 of the Bill of Rights of Constitution of the State of Kansas provides that "all persons, for injuries suffered in person, reputation or property" shall have "remedy by due course of law, and justice administered without delay." KAN. BILL OF RIGHTS, § 18.

182.     Plaintiffs awaiting competency evaluation have a liberty interest in freedom from incarceration and a liberty interest in their cases expeditiously proceeding to trial.

183.     Plaintiffs that have been ordered to undergo a competency evaluation need and require mental health services.

184.     The lengthy confinement of Plaintiffs that have been ordered to undergo a competency evaluation is not reasonably related to the purpose of their current confinement, which is to determine whether or not they are competent to stand trial.

185.     Plaintiffs awaiting competency restoration treatment have a liberty interest in freedom from incarceration, a liberty interest in restorative treatment, and a liberty interest in their cases expeditiously proceeding to trial.

186.    Individuals found incompetent have a constitutional right to individualized treatment to give them a realistic opportunity to be restored to competency.

187.    Plaintiffs that have been ordered to undergo competency restoration treatment need and require mental health services and treatment.

188.    When found incompetent and awaiting restoration treatment, the only lawful purpose for confinement is to treat the individual's mental illness so as to restore them to competency.

189.    The lengthy confinement of Plaintiffs that have been ordered to undergo competency restoration is not reasonably related to the purpose of their current confinement, which is to restore their competency in order for them to stand trial.

190.    Plaintiffs' constitutional rights to their liberty interest in freedom from incarceration and their liberty interest in their cases expeditiously proceeding to trial are violated when detained pretrial with no progress toward trial due to unreasonable wait times to receive necessary mental health services and/or treatment, which is the key external factor in their ability to proceed to trial.

191.    The lengthy confinement amounts to punishment as Plaintiffs suffer in jail without access to proper and court-ordered mental health services and treatment.

192.    The lengthy confinement amounts to further punishment in instances where an individual has been or will be incarcerated for longer than they would be confined if/when sentenced on the underlying charge(s) due to the long wait times.

193.    Plaintiffs' constitutional right to their liberty interest in restorative treatment is violated when detained pretrial with no progress toward trial due to unreasonable wait times to receive necessary mental health treatment and services before they are allowed to proceed to trial.

194.    Named Plaintiffs have been and continue to be confined awaiting competency evaluation and/or competency restoration for unreasonably long wait times in violation of §§ 1 and 18 of the Constitution of the State of Kansas.

195.    Defendants, through KDADS, failed and continue to fail their duty to provide competency evaluations and competency restoration treatment for Plaintiffs in violation of §§ 1 and 18 of the Constitution of the State of Kansas.

196.    Defendants, through KDADS, maintained and continue to maintain unreasonably long wait times for competency evaluations and competency restoration treatment for Plaintiffs for transfer to Larned, thereby violating Plaintiffs' constitutional rights under §§ 1 and 18 of the Constitution of the State of Kansas.

197.    Unless enjoined, Defendants will continue to violate the state constitutional rights of Plaintiffs and others similarly situated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the putative class they seek to represent, request that this court grant the following relief:

a.    Issue an Order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(1)(A);

b.    Issue a class-wide judgment declaring that the policies, practices, and conduct of Defendants, as described in this Complaint, constitute violations of the rights of Plaintiffs and the class they represent under the United States Constitution, Constitution of the State of Kansas, and Title II of the Americans with Disabilities Act;

c.    Issue a Preliminary and Permanent Injunction preventing Defendants from maintaining a waitlist with unconstitutional wait times.

d.    Order KDADS to develop a remedial plan to reduce wait times for competency evaluations and competency restoration treatment to within constitutional limits;

e.    Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

f.    Allow such other and further relief as the court deems just and proper.

## DESIGNATION OF PLACE OF TRIAL

198.    Plaintiffs designate Topeka, Kansas as the place of trial in this action.

Dated this 26th day of May, 2022.

Respectfully submitted,

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF KANSAS**

/s/ Sharon Brett
Sharon Brett KS #28696
Joshua M. Pierson KS #29095
Kayla DeLoach KS #29242
Bria Nelson, KS #29046
6701 W. 64th St. Suite 210
Overland Park, KS 66202
(913) 490-4100
sbrett@aclukansas.org
jpierson@aclukansas.org
kdeloach@aclukansas.org
bnelson@aclukansas.org

**NATIONAL POLICE ACCOUNTABILITY PROJECT OF NATIONAL LAWYERS GUILD**

/s/ Lauren Bonds

Lauren Bonds KS #27807
1403 Southwest Boulevard
Kansas City, Kansas 66103
(620) 664-8584
legal.npap@nlg.org

Keisha James* (DC Bar #1658974)
P.O. Box 56386
Washington, DC 20040
(202) 557-9791
keisha.npap@nlg.org

Eliana Machefsky* (California Bar #342736)
2111 San Pablo Avenue
PO Box 2938
Berkeley, CA 94702
(314) 440-3505
fellow.npap@nlg.org

**STINSON LLP**

/s/ Mark D. Hinderks
Mark D. Hinderks KS #27807
George F. Verschelden KS #21469
Benjamin Levin* (MO Bar # 70196)
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
(816) 691-2706
mark.hinderks@stinson.com
george.verschelden@stinson.com
ben.levin@stinson.com

*Pro Hac Vice application forthcoming*

**Attorneys for Plaintiffs**