# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JESSICA GLENDENING, as next friend
of G.W.; AUDRA ASHER, as next friend
of L.P.; COLIN SHAW, as next friend of
C.B. and N.K.; and LAURA
VALACHOVIC, as next friend of E.K.,

     *Plaintiffs*,

v.                                                                Civil Action No. 5:22-cv-04032TC-GEB

LAURA HOWARD, Secretary of Kansas
Department of Aging and Disability
Services, in her official capacity,
MIKE DIXON, State Hospitals
Commissioner, in his official capacity, and
LESIA DIPMAN, Larned State Hospital
Superintendent, in her official capacity,

    *Defendants*.

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## THEIR MOTION FOR CLASS CERTIFICATION

Plaintiffs filed this case on behalf of themselves and the hundreds of other Kansans who

are currently waiting or will in the future be forced to wait for nearly a year or more for court-

ordered competency evaluation or restoration services. Pursuant to K.S.A §§ 22-3302 and 22-

3303, the Kansas Department of Disability and Aging Services ("KDADS") is required to provide

competency evaluations and restoration treatment for individuals whose competency to stand trial

in a criminal proceeding is called into question.[1] While Kansas law does not require KDADS to

conduct evaluations and restoration treatment at a particular facility, the agency historically has

---

[1] Prosecuting an individual who is not competent to stand trial violates the due process clause of the Fifth Amendment. *See* U.S. Const. Amend. 5; *Pate v. Robinson*, 383 U.S. 375, 378 (1966) (recognizing that conviction of someone deemed legally incompetent violates due process).

relied primarily on Larned State Hospital ("Larned") to provide these services. Recent amendments to K.S.A. § 22-3303 now authorize a district court judge to order treatment and evaluations "on an outpatient or inpatient basis, by an appropriate state, county, or private institution or facility."[2] Despite this, the wait list for evaluation and restoration treatment (hereinafter, "the Wait List") remains months—if not years—long.

Defendants admit their failure to provide timely competency evaluation and restoration treatment services to individuals with mental illness who have been deemed incompetent to stand trial.

Despite the passage of legislation in 2022 authorizing additional funding and expansion of services, there has been no marked improvement for the hundreds of Kansans who remain on the Wait List. As of August 24, 2023, there were approximately 163 individuals in county jails awaiting competency evaluations.[3] As of November 2023, wait times continue to be untenable, with individuals remaining on the Wait List for upwards of 14 months before being transferred to Larned or receiving services elsewhere. Most of these individuals languish in county jails, where they receive little treatment and are housed in un-therapeutic environments that can result in further decline in mental health and stability, self-harm, and continued threats to their safety and well-being. Due to the egregiously long wait for bed space for services and/or treatment, some individuals spend more pretrial time in county jails waiting to be admitted than they would ever receive as a sentence if convicted.

---

[2] K.S.A. § 22-3303(a)(1).

[3] KS Legislature, Special Committee on Mental Health 08/24/2023, YouTube (Aug. 24, 2023), https://www.youtube.com/watch?v=zKF1uL3gSO8 (oral testimony of Kyle Kessler and Committee recommendations).

Plaintiffs filed this lawsuit in May 2022 alongside a motion for a preliminary injunction.[4] Discovery conducted thus far reveals that the harms described in Plaintiffs' complaint one and a half years ago remain unabated. The current competency evaluation and restoration system is failing Kansans with mental illness who are charged with crimes. It forces the seriously ill to remain incarcerated in local county jails at great harm to their mental health and undermines their ability to stabilize enough for them to assist in their own defense. This ongoing practice of lengthy wait times deprives Named Plaintiffs and those similarly situated of their constitutional rights to due process and to be free from cruel and unusual punishment. The lengthy wait times also violate the Kansas Constitution's requirement that justice be provided without delay, as criminal cases do not proceed while individuals are awaiting competency evaluations or restoration treatment. Current practices also deprive Named Plaintiffs and those similarly situated of their right as individuals with qualifying disabilities to receive services and programs in the most integrated setting appropriate to their needs, in violation of the Americans with Disabilities Act ("ADA").

Plaintiffs' claims in this lawsuit are particularly well-suited for class certification. For decades, federal courts have used Federal Rule of Civil Procedure 23 to certify classes in civil rights cases. The drafters of Rule 23(b)(2) designed it to enable civil rights actions seeking to enjoin systemic wrongs, and the Supreme Court has explained that civil rights cases "are often by their nature class suits involving class-wide wrongs."[5]

Plaintiffs seek to represent the following class:

**All individuals who: (1) are now, or will be in the future, charged with a crime in Kansas; and (2) are ordered to receive a mental competency evaluation or restoration treatment under K.S.A. § 22-3302 or K.S.A. § 22-3303.**

---

[4] Docs. # 1, 4, 5.

[5] *E. Tex. Motor Freight, Inc. v. Rodriguez*, 431 U.S. 395, 405 (1977).

Certification under Rule 23(b)(2) is appropriate because Plaintiffs seek final class-wide declaratory and injunctive relief, namely an order that Defendants provide timely competency evaluation and restoration services to Plaintiffs and all other similarly situated individuals. Plaintiffs do not seek monetary damages. Likewise, certification under Rule 23(b)(1)(A) is appropriate to avoid individual lawsuits imposing different standards on how Defendants must provide timely evaluation and restoration services. As set forth more fully below, class certification is proper in this case, and Plaintiffs respectfully request that the Court grant this Motion.

## I.    FACTUAL BACKGROUND

### A.  Kansas Statutes Regarding Competency Evaluations and Restoration Treatment

Under Kansas law, an individual charged with a crime, their counsel, or the prosecuting attorney can request a determination of the person's competency to stand trial.[6] If, upon that request or the judge's own knowledge and observation, the judge finds reason to believe the person is incompetent to stand trial, the court will suspend the criminal proceedings and conduct a hearing to determine the person's competency.[7] In advance of that hearing, the court can order a psychiatric or psychological examination of the person.[8] Following the competency evaluation, if the court determines that the person is not competent to stand trial, the court will order that the individual receive competency restoration treatment.[9]

Historically, Larned was the primary facility in Kansas where individuals facing criminal charges could undergo competency evaluations or receive competency restoration treatments.

---

[6] K.S.A. § 22-3302(a).

[7] *Id*.

[8] *Id.* § 22-3302(a), (c).

[9] K.S.A. § 22-3303.

Amendments to K.S.A. § 22-3303 expanded treatment to include outpatient treatment and evaluation.[10] At the time this lawsuit was filed, KDADS's records revealed that Kansans could wait up to 11 months for admittance to Larned's forensic unit.[11] The passage of time has not improved conditions. The most recent data available through discovery indicates that as of October 20, 2023, the Wait List included 193[12] individuals awaiting evaluation and/or treatment pursuant to K.S.A. §§ 22-3302 and 22-3303, with an average wait time of approximately seven months.[13] At that point, multiple individuals on the Wait List had been waiting for services for upwards of a year, with at least one individual waiting 18 months.[14]

Some individuals on the Wait List face only misdemeanor charges which, by law, result in sentences of no more than 12 months of incarceration.[15] Many others face low-level felony charges which are statutorily limited to sentences of no more than 18 months of incarceration.[16] As a result, in some instances, individuals have spent more time detained pretrial awaiting competency evaluation and/or restoration treatment than they would have otherwise served had they been speedily convicted of their charged offenses. For example, Plaintiff E.K. faced a criminal threat

---

[10] *See* K.S.A. § 22-3303(a)(1).

[11] *See* Mem. in Supp. of Mot. for Prelim. Inj., Doc. # 5.

[12] The total number of people on the list and the average wait times noted in this paragraph are based on the data contained in the Wait List dated October 20, 2023 that KDADS produced in discovery. The average was calculated using the data available for men on the Wait List and excluded an individual who KDADS staff noted could not be located and for whom a warrant had been issued.

[13] *See* Ex. 1, October 20, 2023 Wait List.

[14] *Id.*

[15] *See* K.S.A. § 21-6602(a).

[16] *See, e.g.*, Ex. 2, Decl. of Colin Shaw ("Shaw Decl."), ¶ 4 (Plaintiff C.B. charged with criminal threat); K.S.A. § 21-5415(c) (designating criminal threat as a severity level 9, person felony); K.S.A. § 21-6804 (sentencing grid listing maximum of 17 months incarceration for a severity level 9 nondrug person felony).

charge that carried a maximum sentence of 13 months.[17] Were there not an issue of competency, the likely sentence for this charge would be probation.[18] E.K. was incarcerated for approximately a year before being admitted to Larned.[19]

**B. Plaintiffs' Experiences with the Larned Wait List**

Each Named Plaintiff endured significant wait times for evaluation and/or restoration treatment at Larned.

Plaintiff G.W. is a 37-year-old Native American man who was incarcerated at the Shawnee County Department of Corrections on drug possession charges.[20] On September 10, 2021, G.W. was ordered to undergo competency restoration treatment at Larned pursuant to K.S.A. § 22-3303.[21] G.W. remained at the Shawnee County Department of Corrections until he was admitted to Larned approximately 11 months later.[22] While he was waiting for admission to Larned, G.W. received insufficient mental health care treatment services and was so acutely ill that he was unable or unwilling to communicate with his attorney.[23]

Plaintiff C.B. is a 31-year-old White man who was incarcerated at the Shawnee County Department of Corrections on a criminal threat charge.[24] When charged, C.B.'s maximum

---

[17] Ex. 3, Decl. of Laura Valachovic ("Valachovic Decl."), ¶ 4.

[18] *Id.*

[19] *Id.* ¶ 8.

[20] Ex. 4, Decl. of Jessica Glendening ("Glendening Decl."), ¶ 4.

[21] *Id.*

[22] *Id.*
.
[23] *Id.* ¶ 5.

[24] Ex. 2, Shaw Decl. ¶ 4.

sentence was approximately eight months.[25] According to his competency examination ordered under K.S.A. § 22-3302, C.B. has a psychotic disorder and needed to be treated in a hospital.[26] On January 12, 2022, C.B. was ordered to undergo restoration treatment at Larned pursuant to K.S.A. § 22-3303.[27] C.B. remained at the Shawnee County Department of Corrections until he was admitted to Osawatomie State Hospital approximately five months later.[28] He would have waited much longer if the state had forced him to wait for a bed at Larned.[29] While he was waiting for admission, C.B. was isolated in a special housing unit and deemed a danger to others.[30]

Plaintiff N.K. is a 60-year-old Black man who was incarcerated at the Shawnee County Department of Corrections on charges of aggravated assault, interference, criminal trespass, and disorderly conduct.[31] N.K. underwent a competency exam pursuant to K.S.A. § 22-3302, but due to his decompensated mental state, N.K. refused to leave the jail to attend the hearing.[32] Ultimately, the Court ordered N.K. to undergo a new evaluation.[33] While waiting, N.K. remained in segregation at the Shawnee County Department of Corrections until he was admitted to Larned approximately 14 months later.[34] While he was waiting for admission to Larned, N.K. was so

---

[25] *Id.*

[26] *Id.* ¶ 5.

[27] *Id.* ¶ 6.

[28] *Id.* ¶ 8.

[29] *Id.* ¶ 9.

[30] *Id.* ¶ 6.

[31] *Id.* ¶ 10.

[32] *Id.*

[33] *Id.*

[34] *Id.* ¶¶ 11-12.

mentally ill that his cell reeked of fecal matter, he had chronic trouble keeping his clothes on, and he refused medication.[35]

Plaintiff L.P. is a 34-year-old White man who was incarcerated at the Russell County Jail on drug charges and battery/interference with a law enforcement officer.[36] On July 6, 2021, L.P. was ordered to undergo competency restoration treatment at Larned pursuant to K.S.A. § 22-3303.[37] L.P. remained at the Russell County Jail until he was admitted to Larned approximately 11 months later.[38] While he was waiting for admission, L.P. was segregated in his cell and spent limited time outside. During that time, he was so severely mentally ill that Russell County Jail officials did not allow him to have paper or use a phone, and they did not bring him to the court for his hearings.[39] Additionally, L.P. could not meet with his attorney in person because there was no suitable space at the jail.[40]

Plaintiff E.K. is a 23-year-old man who was incarcerated at the Douglas County Correctional Center on harassment criminal threat charges.[41] When charged, E.K. faced a maximum sentence of 13 months.[42] On October 19, 2021, E.K. was ordered to undergo competency restoration treatment at Larned pursuant to K.S.A. § 22-3303.[43] E.K. remained at the

---

[35] *Id.* ¶ 11.

[36] Ex. 5, Decl. of Audra Asher ("Asher Decl."), ¶ 4.

[37] *Id.* ¶ 5.

[38] *Id.* ¶ 6.

[39] *Id.* ¶ 7.

[40] *Id.*

[41] Valachovic Decl. ¶ 4.

[42] *Id.*

[43] *Id.* ¶ 5.

Douglas County Correctional Center until he was admitted to Larned approximately 12 months later.[44] While he was waiting for admission, E.K. was housed in either administrative segregation or the medical unit.[45] E.K. has suffered from paranoia, psychotic episodes, and seizures.[46] While incarcerated, E.K. refused to speak to his mother and was generally uncooperative with his attorneys.[47]

These individuals are being represented by their "next friends" pursuant to Federal Rule of Civil Procedure 17(c)(2). G.W.'s next friend is his attorney, Jessica Glendening. The next friend for C.B. and N.K. is their attorney, Colin Shaw. L.P.'s next friend is his attorney, Audra Asher. E.K.'s next friend is his mother, Laura Valachovic.[48]

### C. Current Wait List Data

Analysis of data obtained via a Kansas Open Records Act request prior to the filing of this lawsuit shows that in January 2022, Kansans awaiting competency evaluations under K.S.A. § 22-3302 had been waiting, on average, 133 days. Those awaiting restoration treatment under K.S.A. § 22-3303 had been waiting, on average, 151.9 days.[49] As of October 20, 2023, there were 193 individuals on the Wait List.[50] The number of individuals on the Wait List and the wait times have only increased since Plaintiffs filed this suit. The graph below demonstrates how many men have been waiting for treatment or evaluation pursuant to K.S.A. §§ 22-3302 or 22-3303 in intervals of

---

[44] *Id.* ¶ 8.

[45] *Id.* ¶ 6.

[46] *Id.* ¶ 7.

[47] *Id.*

[48] Ex. 4, Glendening Decl. ¶ 3; Ex. 2, Shaw Decl. ¶ 3; Ex. 5, Asher Decl. ¶ 3; Ex. 3, Valachovic Decl. ¶ 3.

[49] *See* Ex. 4 to Mem. in Supp. of Mot. for Prelim. Inj., Doc. # 5-4.

[50] *See* Ex. 1, October 20, 2023 Wait List.

30 days, as of October 23, 2023.[51] The data illustrates that the majority of men on the list wait well over 30 days to be admitted. Notably, 19 individuals had been waiting between 211 and 240 days, 18 individuals had been waiting between 121 and 150 days, 14 individuals had been waiting between 331 and 360 days, and nine individuals had been waiting between 412 and 450 days.



### D. Defendants' Awareness of the Problem

Unacceptable delays in the provision of competency evaluation and restoration services are a notorious and perennial problem of which Defendants have long been aware. In 2020, the Kansas Supreme Court's Ad Hoc Pretrial Justice Task Force found that "[i]t is . . . not unusual (during normal times) for a person to spend more time waiting to go to Larned than the entire sentence the defendant would have been given if the defendant had pled guilty, which is something they are not permitted to do until the competency evaluation is completed at Larned."[52]

---

[51] This graph contains data from the Wait List dated October 20, 2023, provided by KDADS during discovery. The data used to generate the graph excludes an individual who KDADS staff noted could not be located and for whom a warrant had been issued.

[52] Pretrial Justice Task Force, Report to the Kansas Supreme Court 31 (Nov. 6, 2020), https://www.kscourts.org/KSCourts/media/KsCourts/court%20administration/Pretrial_Justice_Task_Force/PJTFReporttoKansasSupremeCourt.pdf.

Kansas officials have repeatedly acknowledged the inexcusable lack of capacity at Larned contributing to the multi-month delay in the provision of evaluation and restoration services. An April 2018 Performance Audit Report stated:

> Individuals may have trouble accessing services at the state's two mental health hospitals because of wait times and a lack of bed space. . . . K.S.A. 39-1602(h) requires community mental health centers to screen individuals to determine if they require treatment in a state mental health hospital. Some community mental health centers reported there can be significant wait times for admission to the state hospitals due to long wait lists and a lack of bed space. This means the community mental health center or the jail must provide crisis management and stabilization services instead of an individual receiving the needed care at the state hospital.[53]

In 2021, the Governor's Budget Association responded to this crisis by restoring funding for 30 beds in Larned's forensic evaluation and treatment unit. However, according to KDADS, Larned continues to operate at reduced capacity due to high staff vacancy rates.[54]

Kansas sheriffs have also long declared that Larned wait times are a significant issue in need of immediate resolution. On October 25, 2021, over 60 Kansas sheriffs sent a letter to Governor Kelly expressing their concern about management and operations at Larned.[55] This letter cited issues with Larned's policies on who is admitted as well as how long it takes to admit

---

[53] Legislative Division of Post Audit, *Performance Audit Report: Community Mental Health: Evaluating Mental Health Services in Local Jails* 23 (April 2018),https://www.kslpa.org/wp-content/uploads/2019/07/1-Final-Report.pdf.

[54] Doc. # 15-1, Aff. of Scott Brunner, ¶ 16.

[55] Jackson Overstreet, 61 Kansas sheriffs call for changes to Larned state hospital admin, process, KAKE.com, November 4, 2021, https://www.kake.com/story/45125959/61-kansas-sheriffs-call-for-changes-to-Larned-state-hospital-admin-process.; KAKE News, Kansas sheriffs send letter to governor asking for changes to KDADS, Larned State Hospital, KAKE.com, Nov. 3, 2021, https://www.kake.com/story/45120737/kansas-sheriffs-send-letter-to-governor-asking-for-changes-to-kdads-Larned-state-hospital.

individuals in need of care.[56] The Kansas sheriffs requested major changes be made to Larned's admission process.[57]

### E. Defendants' Insufficient Efforts to Remedy Wait Times

In 2022, the Kansas legislature attempted to address the unacceptable delays in the provision of competency evaluation and restoration treatment by passing House Bill 2508, effective July 1, 2022. Among other things, HB 2508: (1) increased budgeted funds; (2) increased the available methods of evaluation; and (3) permitted community-based restoration services.[58] At that time, there were 187 individuals on the Wait List, with an average wait time of approximately five and a half months[59] and multiple people waiting over one year.[60] Now, nearly a year and a half later, individuals on the Wait List face even longer wait times. As of October 20, 2023, individuals waited an average of approximately seven months, with multiple individuals still waiting more than a year for treatment and services.[61]

On August 24, 2023, the 2023 Special Committee on Mental Health convened. At that time, Kyle Kessler, the Executive Director for the Association of Community Mental Health Centers of Kansas, Inc., provided written testimony to the committee stating that community-based

---

[56] Overstreet, *supra* n.55.

[57] *Id.*

[58] HB 2508, 2021-2022 Leg., Reg. Sess. (Kan. 2022), https://www.kslegislature.org/li_2022/b2021_22/measures/documents/hb2508_enrolled.pdf.

[59] The average wait times described in this motion were calculated using data and formulas contained in Wait List spreadsheets produced by KDADS, based on each spreadsheet's respective date. The averages were calculated using the data available for men on each respective spreadsheet and excluded an individual who staff from KDADS noted was unable to be located and for whom a warrant had been issued. Plaintiffs attach PDF versions of these spreadsheets as exhibits to this Motion for the Court's convenience. At the Court's request, Plaintiffs will lodge native versions of the spreadsheets with chambers.

[60] Ex. 6, July 29, 2022 Wait List.

[61] Ex. 1, October 20, 2023 Wait List.

mental health services had been established across the state "to address the challenge of individuals waiting, often for excessively long periods of time, in jail to receive evaluation or restoration services."[62] Mr. Kessler further stated that community-based mental health centers "across the state are providing competency evaluations and are in the process of implementing competency restoration services."[63] Yet despite this ostensible increase in resources, discussion during Mr. Kessler testimony and during committee recommendations revealed that approximately 164 individuals remained incarcerated awaiting treatment because no beds were available at Larned.[64]

The available data demonstrates that attempts at legislative reform have failed to adequately remedy the delays in competency evaluations and restoration services for pretrial detainees. Fifteen months later, there have been no improvements in wait times, and individuals continue to suffer while awaiting evaluation and treatment. The length of the Wait List and delays in evaluation and treatment appear to be increasing.

**F.   Harms Resulting from Delayed Admission to Larned**

Housing severely mentally ill individuals for extended periods of time in county jails can cause acute stress and harm.[65] Jail conditions can trigger and worsen mental illness.[66] Confining mentally ill patients "in close quarters with (and without adequate protection from) large numbers of antisocial persons with excess time and few productive activities results in bullying and

---

[62] *Update on the Kansas Community Mental Health System for Special Comm. on Mental Health*, 2023-2024 Leg. Sess. 5 (Kan. 2023) (statement of Kyle Kessler, Executive Director for the Association of Community Mental Health Centers of Kansas, Inc.), https://www.kslegislature.org/li/b2023_24/committees/ctte_spc_2023_special_committee_on_mental_health_1/documents/testimony/20230824_12.pdf (hereinafter, "Kessler Written Testimony").

[63] *Id*.

[64] Oral testimony of Kyle Kessler, *supra* n.3.

[65] Performance Audit Report, *supra* n.53 at 1, 9, 29.

[66] Katie Rose Quandt & Alexi Jones, Research Roundup: Incarceration can cause lasting damage to mental health, Prison Policy Initiative, May 13, 2021, https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts.

predation."[67] According to Dr. Joel Dvoskin, an expert psychologist who regularly consults on the provision of mental health services in criminal justice settings and who has served as a monitor in federal court settlement agreements regarding the treatment of mentally ill individuals incarcerated in state facilities, "the vast majority of American jails have grossly inadequate psychiatric and mental health services, causing inmates to decompensate even more rapidly."[68] For example, while awaiting restorative treatment from KDADS, Plaintiff L.P. decompensated so significantly that he could no longer be brought over to the court for hearings.[69]

L.P.'s devastating experience on the Wait List is a prime example of how KDADS's failure to provide restorative care creates additional barriers for mentally ill people trying to navigate the Kansas criminal legal system. "Jails can exacerbate existing mental health disorders or even lead to the development of post-traumatic stress symptoms like anxiety, depression, avoidance, hypersensitivity, hypervigilance, suicidality, flashbacks, and difficulty with emotional regulation."[70] Moreover, many Kansas jails are overcrowded,[71] making an already harmful carceral environment much worse for those experiencing serious mental illness.[72]

---

[67] E. Lea Johnston, Vulnerability and Just Desert: A Theory of Sentencing and Mental Illness, 103 J. Crim. L. & Criminology 161 (2013).

[68] Ex. 7, Report of Dr. Joel Dvoskin ("Dvoskin Rep.") at 11.

[69] Asher Decl. ¶ 7.

[70] Quandt & Jones, *supra* n.66.

[71] Kansas jail looks at modular units to deal with overcrowding, Associated Press, Nov. 27, 2017, https://apnews.com/article/6e0100481d044b5da2ea304d2356e92d; KAKE News, Sheriff: Sedgwick County jail is facing overcapacity, kake.com, Jan. 18, 2020, https://www.kake.com/story/41581561/sheriff-sedgwick-county-jail-is-facing-overcapacit; Kansas Dep't of Corr., Overcrowding issues to continue at state correctional facilities, June 5, 2019, https://www.doc.ks.gov/newsroom/releases/overcrowding; KSN News, Overcrowding at the jail: A growing problem during the pandemic, KSN.com, Aug. 12, 2020, https://www.ksn.com/news/health/coronavirus/coronavirus-in-kansas/overcrowding-at-the-jail-a-growing-problem-during-the-pandemic/.

[72] Quandt & Jones, *supra* n.66.

County jails are wholly ill-equipped to provide services for individuals with serious mental illness. Due to a lack of resources and trained staff, county jails often resort to confining seriously ill individuals in isolation or solitary confinement, away from the general population, until a bed becomes available at Larned.[73] For example, Plaintiffs C.B. and N.K. both were housed in solitary confinement at the Shawnee County Detention Center.[74] Similarly, Plaintiff E.K. was isolated in either administrative segregation or the Douglas County Jail's medical unit.[75]

For individuals with significant mental health conditions, solitary confinement in Kansas jails can have a grave impact on a person's health and lead to a serious deterioration in mental health.[76] As noted in the Journal of the American Academy of Psychiatry and the Law,

> The adverse effects of solitary confinement are especially significant for persons with serious mental illness, commonly defined as a major mental disorder (e.g., schizophrenia, bipolar disorder, major depressive disorder) that is usually characterized by psychotic symptoms and/or significant functional impairments. The stress, lack of meaningful social contact, and unstructured days can exacerbate symptoms of illness or provoke recurrence. . . . All too frequently, mentally ill prisoners decompensate in isolation, requiring crisis care or psychiatric hospitalization. Many simply will not get better as long as they are isolated.[77]

---

[73] Performance Audit Report, *supra* n.53 at 1, 29 ("A recent survey indicates many jails are not equipped to address the needs of individuals with mental health needs held in those jails"; "The 96 jails across the state are ultimately responsible for inmates' mental health needs while in jail, but jail staff do not have the expertise to provide necessary services.").

[74] Ex. 2, Shaw Decl. ¶¶ 6, 11.

[75] Ex. 3, Valachovic Decl. ¶ 6.

[76] *See* Am. Compl., *Guebara v. Bascue et al.*, No. 19-cv-03025 (D. Kan. Aug. 26, 2019), Doc. # 11 (plaintiff alleges he was placed on lockdown for months at El Dorado Correctional Facility as punishment for requesting medical treatment, causing his health to deteriorate and leading him to attempt suicide); *see also* Noah Taborda, As immigrant's health deteriorates in Seward County Jail, his wife pleads for mercy, Kansas Reflector, Mar. 28, 2021, https://kansasreflector.com/2021/03/28/as-immigrants-health-deteriorates-in-seward-county-jail-his-wife-pleads-for-mercy (explaining that after an inmate with mental health issues was transferred to solitary confinement, "his mental health began to deteriorate…[and] he began to suffer from hallucinations and paranoia and began using concerning and suicidal language" before later attempting suicide).

[77] Jeffrey L. Metzner & Jamie Fellner, Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for [sic] Medical Ethics, 38 J. of the Am. Acad. of Psychiatry & the L. Online 104 (March 2010) http://jaapl.org/content/38/1/104 (footnote omitted).

Indeed, "[t]he shattering impacts of solitary confinement are so well-documented that nearly every federal court to consider the question has ruled that placing people with severe mental illness in such conditions is cruel and unusual punishment in violation of the U.S. Constitution"[78] and "the United States Department of Justice has found that the practice violates both the federal Constitution and federal statutory law."[79] The American Psychiatric Association has formally taken the position that "prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates."[80]

In other cases, people with severe mental illness—including Plaintiffs—may be housed in medical units, which operate as de facto isolation units with little programing, opportunities for recreation, or social interaction. KDADS's delays in providing people treatment therefore creates a Catch-22: there are no suitable, safe, appropriate places in county jails to house those awaiting competency evaluations or restoration treatment services. As a result, people with severe mental

---

[78] American Civil Liberties Union, Briefing Paper: The Dangerous Overuse of Solitary Confinement in the United States 6 (August 2014), https://www.aclu.org/other/stop-solitary-briefing-paper?redirect=criminal-law-reform-prisoners-rights/stop-solitary-briefing-paper; see also Coleman v. Wilson, 912 F. Supp. 1282, 1320–21 (E.D. Cal. 1995) ("[D]efendants' present policies and practices with respect to housing of [prisoners with serious mental disorders] in administrative segregation and in segregated housing units violate the Eighth Amendment rights of class members."); Madrid v. Gomez, 889 F. Supp. 1146, 1265–66 (N.D. Cal. 1995) (holding prisoners with mental illness or those at a high risk for suffering injury to mental health in "Security Housing Unit" is unconstitutional); Casey v. Lewis, 834 F. Supp. 1477, 1549–50 (D. Ariz. 1993) (finding Eighth Amendment violation where, "[d]espite their knowledge of the harm to seriously mentally ill inmates, ADOC routinely assigns or transfers seriously mentally ill inmates to [segregation units]"); Langley v. Coughlin, 715 F. Supp. 522, 540 (S.D.N.Y. 1988) (holding that evidence of prison officials' failure to screen out from SHU "those individuals who, by virtue of their mental condition, are likely to be severely and adversely affected by placement there" states an Eighth Amendment claim).

[79] American Civil Liberties Union, supra n.78, at 7; see also Letter from Thomas E. Perez, Assistant Att'y Gen., U.S. Dep't of Justice, Civil Rights Div. to Tom Corbett, Gov. of Pennsylvania (May 31, 2013), http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf; Resp. of the United States of America to Defs.' Mot. in Lim. No. 4: To Exclude the Statement of Interest at 2–5, Coleman v. Brown, No. 2:90-cv-0520 LKK DAD PC (E.D. Cal. Nov. 12, 2013), Doc. # 4919 (summarizing the federal government's position on the applicability of the Eighth Amendment to the placement of prisoners with serious mental illness in solitary confinement for prolonged periods of time).

[80] Am. Psychiatric Ass'n, Position Statement on Segregation of Prisoners with Mental Illness (November 2017), https://solitarywatch.org/wp-content/uploads/2018/09/APA-Position-Paper.pdf.

illness face housing conditions that range from un-therapeutic and problematic to outright dangerous. Dr. Dvoskin opined that jails are a particularly "dangerous place for people with serious mental illness" due to the perception that they are unsafe, the general conditions of isolation, a lack of adequate psychiatric care, an intolerance among staff toward minor behaviors associated with psychosis, and the stigmas associated with mental illness that run rampant within the jails themselves.[81]

Due to the wait times for admission to Larned, Named Plaintiffs and the putative class may spend almost the same amount of time (or more) in jail waiting to be transferred for treatment and/or evaluation as they would if they were convicted on their underlying charge(s). As a result, people with serious mental illness are effectively serving sentences well beyond what is statutorily authorized.

### G.  Summary of Claims Asserted

Plaintiffs contend that the unjustifiable delays in admitting individuals to Larned or elsewhere for competency evaluations or restoration treatment violate: (1) Plaintiffs' substantive due process rights under the Fourteenth Amendment of the U.S. Constitution; (2) Plaintiffs' rights under the ADA for the provision of mental health services and/or treatment; (3) Plaintiffs' procedural due process rights under the Fourteenth Amendment of the U.S. Constitution; (4) Plaintiffs' rights under the Fourteenth Amendment to be free from cruel and unusual punishment; and (5) Plaintiffs' rights under Sections 1 and 18 of the Kansas Constitution.

---

[81] Ex. 7, Dvoskin Rep. at 10.

## II.    LEGAL STANDARDS

### A.    General Class Certification Standards

Class certification is a two-step inquiry. First, the plaintiff must satisfy the four requirements of Rule 23(a). This requires showing: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Second, the plaintiff must establish that the class meets the prerequisites of at least one of the three types of class actions set forth in Rule 23(b). Plaintiffs here request certification under both Rule 23(b)(2) and 23(b)(1)(A). Certification under Rule 23(b)(2) is appropriate when a defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole[.]" Certification under Rule 23(b)(1)(A) is appropriate where "prosecuting separate actions…would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class."

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."[82] The "court 'must accept the substantive allegations of the complaint as true,' but it cannot 'blindly rely on conclusory allegations which parrot Rule 23.'"[83] Instead, the "district court must engage in its own 'rigorous analysis' of whether 'the prerequisites

---

[82] *DG ex rel. Stricklin v. DeVaughn*, 594 F.3d. 1188, 1194 (10th Cir. 2010) (curations and internal quotations omitted).

[83] *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1873989, at *6 (D. Kan. Feb. 27, 2020) (quoting *Shook v. El Paso Cnty.* (*Shook I*), 386 F.3d 963, 968 (10th Cir. 2004) (quotation cleaned up)).

of Rule 23(a) have been satisfied.'"[84] District courts have considerable discretion when deciding whether to certify a class.[85] "In exercising this discretion, the Court should err on the side of class certification because it has the authority to later redefine or even decertify the class if necessary."[86]

### B. Class Certification Standards in Civil Rights Cases

"Rule 23(b)(2) was drafted in significant measure to enable civil rights actions."[87] The Advisory Committee Notes to the 1966 amendments to the Federal Rules of Civil Procedure name civil rights cases as illustrative of the type of case for which Rule 23(b)(2) was intended.[88] The leading treatises concur.[89]

## III. ARGUMENT

Plaintiffs respectfully request that the Court certify a class under both Rule 23(b)(2) and 23(b)(1)(A). For the reasons set forth below, Plaintiffs have properly defined the class and met the four Rule 23(a) requirements. The class satisfies the Rule 23(b)(2) and 23(b)(1)(A) requirements for relief. The Court should therefore grant Plaintiffs' Motion for Class Certification.

### A. Plaintiffs Satisfy All Elements Under Rule 23(a).

Plaintiffs satisfy each element of Rule 23(a): the class is sufficiently numerous; there are common questions of law or fact; Plaintiffs' claims are typical of those of the proposed class; and

---

[84] *Shook I*, 386 F.3d at 968 (quoting *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 161 (1982)).

[85] *Id.* at 967–68.

[86] *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 503 (D. Kan. 2014).

[87] *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso (Shook II)*, 543 F.3d 597, 610 (10th Cir. 2008).

[88] Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment.

[89] Newberg on Class Actions § 25:25 (4th ed. 2002) ("[C]ertain types of lawsuits, such as those in the criminal justice area, are inherently class actions because individual wrongs can be righted only by institutional reforms affecting an entire class of people."); 5 Moore's Federal Practice - Civil § 23.43(1)(b) (2023) ("Rule 23(b)(2) was promulgated . . . . essentially as a tool for facilitating civil rights actions.").

Plaintiffs will fairly and adequately protect the interest of the class, as set forth below. Class certification is appropriate.

> ### 1.     The proposed class members satisfy Rule 23(a)(1)'s numerosity requirement.

Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable." Plaintiffs' proposed class satisfies this requirement. While Defendants' Wait List fluctuates, there were more than 100 individuals listed at the time this lawsuit was filed.[90] Since filing, the Wait List continues to include more than 100 individuals.[91] Regardless of the list's fluidity, the requirements of Rule 23(a)(1) are met.[92]

Moreover, the proposed class includes not only the individuals currently on the Wait List, but future individuals ordered to receive mental competency evaluations or treatment under K.S.A. §§ 22-3302 and 22-3303. Joinder is impracticable because the class categorically includes unknown future members, and membership in the class is transitory. In such instances, courts recognize that joinder of all class members is "clearly impracticable."[93] The impracticality of joining future class members is particularly pronounced with inherently revolving detainee populations such as individuals with mental disabilities who are charged with crimes.

---

[90] *See* Ex. 4 to Mem. in Supp. of Mot. for Prelim. Inj., Doc. # 5-4.

[91] *See, e.g.*, Ex. 8, Compiled Wait Lists for November 17, 2022, May 26, 2023, and August 29, 2023.

[92] *See Rex v. Owens ex rel. Oklahoma*, 585 F.2d 432, 436 (10th Cir. 1977) ("Class actions have been deemed viable in instances where as few as 17 to 20 persons are identified as the class."); *Horn v. Associated Wholesale Grocers, Inc.*, 555 F.2d 270, 275–76 (10th Cir. 1977) (holding that district court erred in denying class certification on numerosity grounds where class consisted of 41 to 46 individuals); *Jackson v. Ash*, No. 13-cv-2504-EFM, 2014 WL 1230225, at *3 (D. Kan. Mar. 25, 2014) ("[C]ourts have found that classes as small as twenty members can satisfy the numerosity requirement, and a good faith estimate of at least 50 members is a sufficient size to maintain a class action." (internal quotation marks omitted)).

[93] *See, e.g.*, *Skinner v. Uphoff*, 209 F.R.D. 484, 488 (D. Wyo. 2002) ("[N]umerosity is met where … the class includes individuals who will become members in the future. As members *in future*, they are necessarily unidentifiable, and therefore joinder is clearly impracticable."); *See also Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975) (noting that pretrial detention is "by nature, temporary" and that claims asserted by pretrial detainees fall within the "capable of repetition, yet evading review" mootness exception).

The numerosity requirement of Rule 23(a) is therefore met.

**2.     The class presents common questions of fact and law.**

To show commonality under Rule 23(a)(2), a putative class must raise a common contention that is "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[94] Put another way, "[w]hat matters to class certification … [is] the capacity of a classwide proceeding to generate common *answers* apt to drive resolution of the litigation."[95] "[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do."[96] Thus, class suits seeking injunctive or declaratory relief "by their very nature often present common questions satisfying Rule 23(a)(2)."[97]

Plaintiffs easily meet the commonality standard. The claims of the Named Plaintiffs and the putative class members are based on a common course of conduct: Defendants' failure to timely provide competency evaluation and restoration services, resulting in individuals with mental health issues waiting in jails for months on end. The Named Plaintiffs and the putative class assert that Defendants' conduct violates their due process rights under the Fourteenth Amendment of the United States Constitution, Sections 1 and 18 of the Kansas Constitution, and the ADA, and should be enjoined. As such, an injunction would provide class-wide relief. Common issues of fact and law for the putative class include:

- Is it a procedural due process violation to confine individuals in jail for unreasonable lengths of time when awaiting competency or restoration treatment as is court-ordered under K.S.A. §§ 22-3302 and 22-3303?

---

[94] *Wal-Mart Stores, Inc. v. Dukes*, 151 S. Ct. 2541, 2545 (2011).

[95] *Id.* at 2551 (emphasis in original) (quotations omitted).

[96] *Id.* at 2556.

[97] 7A Wright, Miller & Kane, Federal Practice & Procedure § 1763, at 226.

- Is it a substantive due process violation to confine individuals in jail for unreasonable lengths of time when awaiting competency or restoration treatment as is court-ordered under K.S.A. §§ 22-3302 and 22-3303?

- Is it a substantive due process violation to confine individuals in jail for months longer than their total potential sentence when awaiting competency or restoration treatment as is court-ordered under K.S.A. §§ 22-3302 and 22-3303?

- Is it cruel and unusual punishment in violation of the Fourteenth Amendment to confine individuals in jail for unreasonable lengths of time when awaiting competency or restoration treatment as is court-ordered under K.S.A. §§ 22-3302 and 22-3303?

- Have Defendants failed to fulfill their duty and obligations under K.S.A. §§ 22-3302 and 22-3303 by significantly delaying the provision of competency evaluations and restoration treatment for individuals who are to be transferred to Larned pursuant to court orders?

- Is the putative class harmed by staying in jail, awaiting admission to Larned or elsewhere, when they have been ordered to receive competency evaluations or competency restoration treatment?

- What effect does *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) have on Defendants' obligations to provide community-based alternatives to incarceration pending admission to Larned?

- Is it an *Olmstead* violation to fail to provide community-based treatment when there are unreasonably long wait times to be admitted to Larned?

- Are Plaintiffs and putative class members who are ordered to receive competency evaluations or competency restoration treatment covered by the ADA?

- Have Defendants violated the ADA by failing to provide mental health services and/or treatment in the most integrated setting appropriate to the disabled individuals' needs?

- A common fact issue for the putative class is the cause of the unreasonably long wait times to be admitted to Larned.

- A common fact issue for the putative class is the availability of alternative programs to reduce the wait times to be admitted to Larned.

- A common fact issue for the putative class is the length of time individuals spend on the waitlist to be admitted to Larned.

Moreover, Defendants admit that extended inclusion on the Wait List is caused by the lack of resources at Larned, not any individual characteristic of specific criminal defendants.[98] Thus, whether Defendants have violated the putative class members' constitutional rights by consistently maintaining a lengthy wait list to provide court-ordered mental health services may be made on a class-wide basis, and an injunction would provide class-wide resolution "in one stroke."[99]

In certifying a Rule 23(b)(2) class in a similar case challenging unconstitutional delays in the provision of competency restoration treatments, the District of Utah determined that commonality existed:

> Here, common questions exist. The common questions of fact include whether incompetent defendants who are committed to the custody of DHS's director or a designee to receive court-ordered competency restoration treatment spend extended periods in county jails before receiving adequate treatment; and if so, whether the State uses a procedure to ensure that those delays, and the place and manner of that treatment, are the product of judgment rendered by a qualified professional. The answers to those questions of fact may implicate a common question of law: whether the State violates the substantive due process rights of incompetent defendants to be free from conditions or restrictions of confinement that amount to punishment absent a criminal conviction by keeping those defendants in jail for extended periods while they wait to receive competency restoration treatment that is the product of professional judgment.[100]

Plaintiffs have therefore satisfied the commonality requirement in Rule 23(a).

### 3.    Rule 23(a)(3)'s typicality requirement is satisfied because the claims of the Plaintiffs are representative of those of the proposed class.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."[101] "Typicality refers to the nature of the claim or defense

---

[98] Doc. # 15-1, Aff. of Scott Brunner, ¶ 16.

[99] *Wal-Mart*, 131 S. Ct. at 2545. *Cf. Ash*, 2014 WL 1230225, at *4 (finding commonality requirement satisfied based on the common question of whether the county jail's mail policies were constitutional).

[100] *Disability Law Ctr. v. Utah*, No. 2:15-cv-00645-RJS, 2016 U.S. Dist. LEXIS 132653, *13–14 (D. Utah Sept. 27, 2016).

[101] Fed. R. Civ. P. 23(a)(3).

of the class representative and not to the specific facts from which it arose or to the relief sought. Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."[102]

Named Plaintiffs' claims are typical of the claims of the proposed class. Each of the Named Plaintiffs have alleged harms resulting from prolonged detention in jails while awaiting court-ordered competency evaluation or restoration services from Defendants. Thus, the injuries suffered by the Named Plaintiffs are typical of the class as a whole. Each Named Plaintiff and each class member has suffered, or will suffer, from Defendants' delay in providing court-ordered evaluations or restoration treatment.

The proposed class representatives (as next friend representatives) are part of the putative class and have the same interest as their fellow class members. First, the proposed class representatives have the same interest as class members in not waiting unconstitutional lengths of time to receive either a competency evaluation, competency restoration treatment, or both. Second, the proposed class representatives have the same liberty interests as class members in freedom from incarceration and restorative treatment. Third, the proposed class representatives have the same interest as class members in being free from cruel and unusual punishment. Last, the proposed class representatives have the same interest as class members in community-based treatment for those awaiting competency restoration treatment, if available.

Typicality is not defeated simply because there is variation in the length of time each Named Plaintiff and putative class member must wait for admission to Larned. The Tenth Circuit has ruled that typicality is satisfied when the entire class is subject to the same practices or policies,

---

[102] 1 Newberg, § 3.15, at 335.

regardless of the existence of individual factual differences.[103] Here, the Larned Wait List does not result from any facts unique to an individual but rather from Defendants' failure to provide staffing and facilities adequate to meet their constitutional obligations to Plaintiffs. Named Plaintiffs and the putative class all seek the same declaratory and injunctive relief. Thus, Rule 23(a)(3)'s typicality requirement is satisfied.

> The District of Utah has explained why typicality is satisfied under similar circumstances:

> The typicality requirement is met here. Plaintiffs and the proposed class members assert the same interest: the right to be free from conditions or restrictions of pretrial confinement that amount to punishment absent a criminal conviction. They also assert the same injury: denial of that right due to their extended periods of pretrial detention in county jails after being declared incompetent and being transferred to the custody of DHS's executive director or a designee to receive restorative treatment. Also, Plaintiffs' claims and the class members' claims are based on the same legal and remedial theory: that the substantive due process right of incompetent defendants requires injunctive relief against the allegedly unconstitutional delays.[104]

As with numerosity and commonality, Plaintiffs have satisfied their burden in demonstrating typicality between class representatives and class members, as required by Rule 23(a).

### 4. Named Plaintiffs will fairly and adequately protect the interests of the proposed class, and counsel are qualified to prosecute this action.

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." This includes a requirement that both Named Plaintiffs *and* their counsel be

---

[103] *See DG*, 594 F.3d at 1199 ("[T]ypicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances."); *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988) ("[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory."); *see also Progeny et al. v. City of Wichita*, No. 21-cv-01100, 2023 U.S. Dist. LEXIS 181912, at *18–19 (D. Kan. Oct. 10, 2023) (granting class certification for individuals on a Gang List and finding typicality satisfied where "[t]he core of each Plaintiffs' case is that inclusion on the Gang List violates their constitutional rights, thus exposing each to the same risk of harm. . . . Plaintiffs' claims stem from facts common to all class members . . . and request relief applicable to all class members . . . .").

[104] *Disability Law Ctr.*, 2016 U.S. Dist. LEXIS 132653, at *17–18.

poised to adequately represent the interests of the class. Plaintiffs unquestionably meet this standard.

### a)    Named Plaintiffs

Named Plaintiffs and the putative class raise the same claims giving rise to common questions of law and fact. Named Plaintiffs do not have any interests that are in conflict with the putative class. Named Plaintiffs and the putative class share a common interest in a remedy that will prevent further violations of their constitutional rights. Named Plaintiffs and putative class members seek to ensure that mentally incompetent criminal defendants are not subject to unconstitutionally lengthy delays in obtaining competency evaluations and treatment from Defendants.

Each Named Plaintiff has been adjudged mentally incompetent to stand trial in a criminal proceeding. As a result, Named Plaintiffs' interests may need to be asserted through representatives such as a next friend or a guardian ad litem.[105] In an action where next friends represent incompetent persons under Rule 17, the next friends must be dedicated to the Named Plaintiffs' best interest, be familiar with the litigation, understand why Named Plaintiffs seek relief, and be willing and able to pursue the case on behalf of Named Plaintiffs. Named Plaintiffs' next friends understand that this case is a class action. Each of them is dedicated to the best interests of not only the Named Plaintiffs, but also of the putative class.  Each of the next friends is familiar with this litigation, understands the need for the relief sought, and is willing and able to pursue this case on behalf of the Named Plaintiffs and putative class. Named Plaintiffs have pursued this case for the last year and a half, filing numerous briefs, encouraging the start of discovery, and

---

[105] Defendants agree that the next friends of the Named Plaintiffs have standing to prosecute these claims. Doc. # 25 at 20.

otherwise attempting to move their claims forward. They have demonstrated a clear commitment to this litigation and the interests of the entire class.[106]

Named Plaintiffs are adequate representatives of the Plaintiff Class under Rule 23.

### b) Class Counsel

When determining counsel's adequacy, the Court must consider (1) if the "named plaintiff and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class."[107]  Furthermore, the Court must also consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class."[108] Plaintiffs' counsel meet all of these requirements and should be appointed class counsel.

The ACLU of Kansas ("ACLU") is a statewide non-profit organization dedicated to litigating civil rights cases, including complex class action claims on behalf of marginalized communities. Attorneys at the ACLU currently serve as class counsel in another federal civil rights action in this District before Judge Melgren.[109]

---

[106] Ex. 4, Glendening Decl. ¶¶ 6-19 ; Ex. 2, Shaw Decl. ¶¶ 13-26; Ex. 5, Asher Decl. ¶¶ 8-21; Ex. 3, Valachovic Decl. ¶¶ 9-22.

[107] *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002) (quotation omitted).

[108] Fed. R. Civ. P. 23(g)(1)(A).

[109] *Progeny*, 2023 U.S. Dist. LEXIS 181912, at *25 (finding that the ACLU and its co-counsel "are well-known entities with significant experience litigating civil rights claims as well as class actions," and that "there is little doubt based on counsel's wide experience and intelligent briefing . . . that they possesses knowledge of applicable law for Plaintiffs' claims"); Ex. 9, Decl. of Sharon Brett ("Brett Decl."), ¶¶ 2-5.

The National Police Accountability Program ("NPAP") is a national non-profit organization and project of the National Lawyers Guild. NPAP is dedicated to litigating federal civil rights cases, including complex class action claims on behalf of individuals in their encounters with law enforcement and detention facility personnel. Like the ACLU, NPAP attorneys have litigated numerous class action cases, including cases in the District of Kansas.[110]

Stinson LLP ("Stinson") is a law firm with more than 450 attorneys in offices nationwide. Stinson's attorneys have represented both plaintiffs and defendants in disputes relating to federal and state constitutional provisions and have extensive experience in class action litigation for private and pro bono clients.[111]

The ACLU, NPAP, and Stinson will vigorously prosecute this action on behalf of the class. They have already engaged in substantial work investigating and identifying the claims Plaintiffs now bring. Counsel devoted the time, resources, and effort necessary to lay the groundwork for this litigation by investigating the underlying systemic problems that led to the filing of this case and identifying class representatives and next friends. After evaluating the applicable law, counsel proceeded to develop class claims based on issues common to the Named Plaintiffs and other similarly situated individuals. Counsel retained an expert witness, Dr. Joel Dvoskin, and promptly moved for a preliminary injunction.[112] Counsel have the expertise and resources to vigorously prosecute this case moving forward.

The ACLU, NPAP, and Stinson satisfy the requirements of Rule 23 for appointment as class counsel. They have no conflicts with the putative class, and have and will continue to

---

[110] Ex. 10, Decl. of Lauren Bonds ("Bonds Decl."), ¶¶ 2-5.

[111] Ex. 11, Decl. of George Verschelden ("Verschelden Decl."), ¶¶ 4, 13-15.

[112] *See* Mot. for Prelim. Inj., Doc. # 4.

vigorously prosecute this action. They are thoroughly familiar with the applicable law and possess extensive experience in handling class action suits and representing individuals with mental illnesses. Moreover, they have the personnel and financial resources necessary to litigate this case on behalf of the putative class. They are committed to devoting the time and resources necessary to ensure Kansans with mental illness have timely access to competency evaluation and restoration services and that their constitutional rights are protected.[113]

**B.  Plaintiffs Seek Class Certification under Rule 23(b)(2) or Rule 23(b)(1)(A).**

In addition to the requirements of Rule 23(a), a class action must also meet the requirements of one of the provisions of Rule 23(b). Given the circumstances of the underlying matter, Plaintiffs seek certification under either Rule 23(b)(2) or Rule 23(b)(1)(A).

**1.      Class certification under Rule 23(b)(2) is warranted.**

Rule 23(b)(2) authorizes class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

Rule 23(b)(2) "imposes two independent but related requirements."[114] The defendants' actions or inactions must be based on grounds generally applicable to all class members, and the final injunctive relief must be appropriate for the class as a whole.[115] This second requirement requires that the class be "amenable to uniform group remedies."[116] Thus, a class must be sufficiently cohesive such "that any classwide injunctive relief can satisfy the limitations of

---

[113] Ex. 9, Brett Decl. ¶¶ 2-8; Ex. 10, Bonds Decl. ¶¶ 2-8; Ex. 11, Verschelden Decl ¶¶ 4-18.

[114] *Shook II*, 543 F.3d at 604.

[115] *Id*.

[116] *Id*.

Federal Rule of Civil Procedure 65(d) – namely, the requirement that it 'state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required."[117]

Named Plaintiffs seek systemic, not individual, relief. Thus, class-wide injunctive and declaratory relief is appropriate for a Rule 23(b)(2) class.

Rule 23(b)(2) often serves as the vehicle for civil rights actions challenging a common course of conduct. The language of Rule 23(b)(2) does not require that the defendant's conduct be directed or damaging to every member of the class.[118] Indeed, the Supreme Court recognizes that Rule 23(b)(2) does not require individual inquiries into each class members' claims for declaratory and injunctive relief.[119] "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."[120]

Classes asserting substantive due process claims are commonly certified.[121] Addressing a substantially similar request for class certification, the District of Utah certified a Rule 23(b)(2)

_____

[117] *Id.* (quoting Rule 65(d)(1)).

[118] *See* Newberg & Conte, 1 Newberg on Class Actions, § 4.11, at 4-37 (1992).

[119] *Wal-Mart*, 131 S. Ct. at 2558 ("When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident.").

[120] *Id.* at 2557; *see also Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3rd Cir. 1994) (ruling that Rule 23(b)(2) "is almost automatically satisfied in actions primarily seeking injunctive relief").

[121] *See, e.g.*, *E. Tex. Motor*, 431 U.S. at 405 ("We are not unaware that suits [alleging violations of civil rights] are often by their very nature class suits, involving class wide wrongs."); *DG*, 594 F.3d at 1194 (affirming certification of a class of foster children alleging that Oklahoma's policies violated the class's substantive due process right to be reasonably free from harm while in state custody); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 330 n.24 (4th Cir. 2006) ("Rule 23(b)(2) was created to facilitate civil rights class actions.") (citations omitted); *Feltz v. Regalado*, No. 8-cv-0298-SPF-JFJ, 2023 U.S. Dist. LEXIS 74634, at *29 (N.D. Okla. May 16, 2023) (certifying a Rule 23(b)(2) class because the request for certain factors to be considered before the imposition of a secured money bail was reasonably specific and beneficial to the entire class); *Martinez v. Reams*, No. 20-CV-00977-PAB-SKC, 2020 WL 7319081, at *6 (D. Colo. Dec. 11, 2020) (certifying a Rule 23(b)(2) class because a single injunction would provide appropriate relief to all class members when such relief did not need to be specifically tailored to each member of the class); *May v. Utah Dep't of Corr.*, No. 2:18-CV-854-RJS-CMR, 2020 WL 1434118, at *5 (D. Utah Mar. 24, 2020) (certifying a class under Rule 23(b)(2) because defendant's actions applied generally to the class and the injunctive relief requiring the use of specific medical treatment was appropriate for the whole class); *Jones v. Gusman*, 296 F.R.D. 416, 465–67 (E.D. La. 2013) (certifying class of pre- and post-trial detainees challenging conditions of confinement); *Clay v. Pelle*, No. 10-cv-01840-WYD-BNB, 2011 WL 843920, at *7 (D. Col. Mar. 8, 2011) (ruling

class of incompetent pretrial detainees who were held in jails for extended periods of time while they waited to receive court-ordered competency restoration services. In certifying a class, the court addressed the Rule 23(b)(2) requirements in *Disability Law Center v. Utah*:

> First, the State allegedly detains incompetent defendants in county jails for extended periods after a court has committed them to the custody of DHS's executive director or a designee on grounds generally applicable to all class members: there is no room at USH. While some class members may attain competency under the Outreach Program, the State seemingly implemented that program for the same reason many incompetent defendants must wait in jail for extended periods after being declared incompetent: USH is full.

> Second, proposed class members' injuries are amply similar that they can be remedied through an injunction that does not differentiate between Plaintiffs or proposed class members. Plaintiffs' chief complaint is that there is an unreasonable delay between the date a court declares a criminal defendant incompetent and the date that defendant receives competency restoration treatment in a place and manner that is the product of judgment rendered by a qualified professional. Plaintiffs here seek to remedy this delay through an injunction requiring the State to provide that treatment within a reasonable period from the date a court transfers a defendant to the custody of the DHS's director or a designee to receive treatment. If Plaintiffs can establish the State is violating the due process rights of incompetent defendants, and make their required showing under Rule 65, the court is confident it can fashion an injunction that states its terms specifically and describes in reasonable detail the acts restrained or required. The court is also confident such an injunction would not require specific relief tailored to each member. The proposed class is cohesive.[122]

Defendants have failed to provide competency evaluation and restoration treatment within a reasonable period of time. It is not uncommon for individuals to wait in jail for up to 11 months or more after issuance of the order committing them for evaluation or treatment until Defendants accept custody. Plaintiffs seek injunctive and declaratory relief to end this practice and to halt the

---

that class certification was necessary for system-wide declaratory and injunctive relief given the frequency that individuals, including named plaintiffs, are released from jail); *Skinner v. Uphoff*, 209 F.R.D. 484, 487–89 (D. Wyo. 2002) (certifying class of prison detainees challenging a prison's conditions and seeking relief under 42 U.S.C. § 1983).

[122] 2016 U.S. Dist. LEXIS 132653 at *22–24.

harm Defendants' conduct inflicts on the putative class. Numerous other courts across the country have awarded such relief in similar cases.[123]

Likewise, Plaintiffs' contention that Defendants are violating the ADA is appropriate for a Rule 23(b)(2) class. Defendants are responsible for creating the conditions whereby individuals with disabilities must wait in jails for prolonged periods of time. As a result of these actions, individuals with disabilities are subjected to unjustified isolation while incarcerated. The case of *M.A.C. v. Betit* is instructive.[124] There, the plaintiffs alleged that defendant state agencies and individuals violated several federal statutes, including the ADA. The plaintiffs sought to certify a class consisting of all current and future Medicaid-eligible individuals in Utah who, because of their disabilities, were or would be on a waitlist to receive services under the Home and Community Based Services ("HCBS") waiver for the Division of Services for People with Disabilities.[125] The plaintiffs alleged that Utah capped their HCBS waiver to limit the people eligible to receive services and sought injunctive and declaratory relief to eliminate and reverse the HCBS waitlist policy.[126] The District of Utah ultimately found that the class met the Rule

---

[123] *See, e.g.*, *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("[A] person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."); *Trueblood v. Wash. State Dep't of Soc. and Health Servs., et al.*, 822 F.3d 1037, 1046 (9th Cir. 2016) (reversing district court's permanent injunction ruling that seven days is the maximum justifiable period of incarceration while awaiting competency evaluation and restoration services in light of recently enacted state law setting a fourteen-day maximum time limit for competency evaluations); *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1105 (9th Cir. 2003) (upholding an injunction mandating that incompetent criminal defendants be transferred to a state hospital within seven days of the commitment order); *Ctr. for Legal Advoc. v. Bicha*, No. 11-CV-02285-NYW, 2018 WL 6834597, at *1 (D. Colo. Dec. 28, 2018) (noting that parties agreed to a settlement in which state could offer admission for competency evaluations or restorative treatment within 28 days of a court order); *Advocacy Ctr. for Elderly and Disabled v. La. Dep't of Health and Hosps.*, 731 F. Supp. 2d 603, 627 (E.D. La. 2010) (enjoining and ordering defendants to transfer incompetent detainees to the state hospital within twenty-one days of a court order).

[124] 284 F. Supp. 2d 1298 (D. Utah 2003).

[125] *Id*. at 1301–02.

[126] *Id*.

23(b)(2) requirements and that the requested declaratory and injunctive relief was amenable to all members of the certified class.[127]

In sum, Defendants have failed to fulfill their statutory and constitutional obligations to provide competency evaluations or restoration treatment to the putative class in a timely manner. Defendants have ignored their statutory obligations to provide mental health services and/or treatment in the most integrated setting appropriate as to the needs of all of the Plaintiffs and putative class members. The necessary remedy is declaratory and injunctive relief to prevent further injury to the class. Further, relief would not need to be tailored to each class member as the same declaratory and injunctive relief related to KDADS's Wait List practices would provide relief to all the putative class members.[128]

### 2. Class certification under rule 23(b)(1)(a) is warranted.

Rule 23(b)(1)(A) states that a class may be maintained if Rule 23(a) is satisfied and if "prosecuting separate actions by or against individual class members would create risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class."

Certification of a class under Rule 23(b)(1)(A) "requires there be 'more than the mere possibility that inconsistent judgments and resolutions of identical questions of law would result if numerous actions are conducted instead of one class action.'"[129] "[T]he fact that the defendant might 'win some and lose others' if faced with separate suits does not mean that certification is

---

[127] *Id.*

[128] *Cf. Ash*, 2014 WL 1230225, at *6 (certifying a class under Rule 23(b)(2) where the only relief sought was an order enjoining defendant from continuing a practice that allegedly violated the class's constitutional rights).

[129] *In re YRC Worldwide, Inc. v. ERISA Litig.*, No. 09-2593-JWL, 2011 WL 1303367, at *12 (D. Kan. Apr. 6, 2011) (quoting *In re Integra Realty Res., Inc.*, 354 F.3d 1256, 1263–64 (10th Cir. 2004)).

appropriate" under Rule 23(b)(1)(A).[130] Instead, certification is appropriate where the defendant "could be sued for different and incompatible affirmative relief."[131] The "risk of 'incompatible standards of conduct' which the Rule 'was designed to protect against involves situations where the [defendant] does not know, because of inconsistent adjudications, whether or not it is legally permissible for it to pursue a certain course of conduct.'"[132]

In addition, Rule 23(b)(1)(A) certification is appropriate where the party is "obliged by law to treat the members of the class alike."[133] Plaintiffs seek injunctive relief requiring Defendants to provide timely competency evaluations and restoration treatments based on a court order; the nature or severity of the individual's mental illness is not relevant. And the Larned Wait List exists independently of the mental health state of the putative class members—it is the result of Defendants' failure to ensure sufficient beds and staff at Larned and to provide for community-based alternatives that actually decrease reliance on Larned. For Defendants' sake, there should be one determination that sets the standard on what is considered timely initiation of evaluation and restoration services. Otherwise, different district court judges could rule differently regarding the constitutionality of wait times, resulting in contradictory standards on the question of fact as to whether the wait times are reasonable and what amount of time would be acceptable.

Courts have certified classes under Rule 23(b)(1)(A) in similar cases. In *Fletcher v. United States*, the plaintiffs moved to certify a class alleging that the defendants "failed to fulfill their

---

[130] *Id.*

[131] *Id.*

[132] *Id.* (internal citations omitted).

[133] *Gentry v. Kostecki*, No. 20-CV-01284-WJM-STV, 2021 WL 1428187, at *5 (D. Colo. Apr. 14, 2021) (quoting *Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 633 (6th Cir. 2011) and citing as examples a utility company's interactions with customers and a government imposition of a tax).

statutory duties to provide an accounting" under 25 U.S.C. § 4011.[134] The court ruled that "classes seeking declaratory relief against the government, such as a proposed accounting, are appropriately certified under Rule 23(b)(1)(A), if 'any inconsistency in judgments or orders in lawsuits involving individual class members of the class automatically will impose incompatible standards of behavior on the party opposing the class.'"[135] The court also noted that "allowing multiple claims to proceed against the government would risk incompatible orders directing the government to account in contradictory manners."[136]

In *Ashley v. Regional Transportation District*, plaintiffs alleged that the trustees of their pension plan applied the amended terms of the plan in a manner that adversely affected the calculation of their pension amounts.[137] The court ruled that certification under Rule 23(b)(1)(A) was appropriate because "[i]f individual cases were brought, the likelihood that different judges would be involved in the various cases filed is great," and that "[e]ach judge will . . . resolve the issues before it creating a risk of incompatible standards as to the plan and as to the Trustees."[138] The *Ashley* court concluded that certifying the case as a class action would hold defendants to "one standard of conduct applicable to all persons in the class."[139]

Finally, in *Hilton v. Wright*, plaintiffs alleged that "defendants refused to administer necessary treatment for their Hepatitis C because they had not completed a DOCS-sponsored

---

[134] No. 02-CV-427-GKF-PJC, 2014 WL 356895, at *1 (N.D. Okla. Jan. 31, 2014).

[135] *Id.* (internal citations omitted).

[136] *Id.*

[137] No. 05-CV-01567-WYD-BNB, 2008 WL 384576, at *1 (D. Colo. 2008).

[138] *Id.* at *6.

[139] *Id.*

substance abuse program."[140] However, the required substance abuse program typically had long wait lists, delaying prisoners' ability to begin the program. As such, the plaintiffs filed suit under the ADA. The court held that Rule 23(b)(1)(A) class certification was appropriate "where the [defendant] is obliged by law to treat the members of the class alike, or where the [defendant] must treat all alike as a matter of practical necessity.[141] In addition, the court held that "the members of the proposed class of plaintiffs are scattered throughout the state of New York; individual cases would inevitably be brought in a variety of state and federal courts, where there is a definite possibility of inconsistent results."[142]

Plaintiffs seek injunctive relief against multiple government officials. Applying the analysis from *Fletcher*, *In re Williams*, and *Hilton*, Rule 23(b)(1)(A) certification is appropriate to avoid subjecting Defendants to numerous individual cases with different judges that may create multiple standards of conduct applicable to Defendants' provision of evaluation and restoration services.

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court certify this case as a class action with the class defined as:

> **All individuals who: (1) are now, or will be in the future, charged with a crime in Kansas; and (2) are ordered to receive a mental competency evaluation or restoration treatment under K.S.A. § 22-3302 or K.S.A. § 22-3303.**

Plaintiffs also respectfully request that the Court appoint Named Plaintiffs as class representatives, and appoint the ACLU, NPAP, and Stinson as Class Counsel.

---

[140] 235 F.R.D. 40, 44 (N.D.N.Y. 2006).

[141] *Id.* at 54 (internal citations omitted).

[142] *Id.*

Dated: November 17, 2023

Respectfully submitted,

**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
KANSAS**

s/ Sharon Brett
Sharon Brett KS #28696
Karen Leve KS #29580
Kunyu Ching KS #29807
10561 Barkley St, Suite 500
Overland Park, KS 66212
(913) 490-4100
sbrett@aclukansas.org
kleve@aclukansas.org
kching@aclukansas.org

**NATIONAL POLICE
ACCOUNTABILITY PROJECT**

s/ Lauren Bonds
Lauren Bonds KS #27807
1403 Southwest Boulevard
Kansas City, Kansas 66103
(620) 664-8584
legal.npap@nlg.org

Keisha James* (DC Bar #1658974)
P.O. Box 56386
Washington, DC 20040
(202) 557-9791
keisha.npap@nlg.org

Eliana Machefsky* (CA Bar
#342736)
2111 San Pablo Avenue
PO Box 2981
Berkeley, CA 94702
(314) 440-3505

fellow.npap@nlg.org

**STINSON LLP**

s/ George F. Verschelden
George F. Verschelden KS #21469
Mark D. Hinderks KS #27807
Benjamin Levin KSD #79008
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
(816) 691-2706
george.verschelden@stinson.com
mark.hinderks@stinson.com
ben.levin@stinson.com

***Attorneys for Plaintiffs***

*\*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 17, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notifications of such filing to the email addresses of all counsel of record.

s/ Sharon Brett
Sharon Brett
