**In the United States District Court**
**for the District of Kansas**

---

Case No. 22-cv-04032-TC-ADM

---

JESSICA GLENDENING, AS
NEXT FRIEND OF G.W., ET AL.,

*Plaintiffs*

v.

LAURA HOWARD, SECRETARY OF KANSAS DEPARTMENT
OF AGING AND DISABILITY SERVICES, ET AL.,

*Defendants*

---

## MEMORANDUM AND ORDER

Plaintiffs sue on behalf of criminal defendants charged with violating Kansas state laws who are being held under orders for competency evaluation and restoration while awaiting trial in Kansas state courts. They move for a preliminary injunction based on the assertion that the State of Kansas's waitlist for admission into Kansas's only facility for competency restoration violates the Fourteenth Amendment to the United States Constitution. For the following reasons, Plaintiffs' motion for a preliminary injunction is denied.

### I

### A

A preliminary injunction is an extraordinary remedy, with "the limited purpose…to preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citation and quotation marks omitted). Under Rule 65 of the Federal Rules of Civil Procedure, the party seeking a preliminary injunction must show four things: that "they are substantially likely to succeed on the merits of their claims," "they will suffer irreparable harm if the injunction is denied," "their threatened injury without the injunction outweighs any harm to the party opposing the

injunction," and "the injunction, if issued, is not adverse to the public interest." *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018)).

A preliminary injunction is never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Thus even a standard preliminary injunction—one that simply preserves the position of the parties pending trial—is extraordinary. *Id.* Those seeking to mandate specific action rather than prohibit it, change the status quo, or grant all the relief a victorious movant could obtain at trial are even more disfavored. *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019). Movants seeking a disfavored injunction must make a strong showing of likely success on the merits and a balance of harms that tilts in their favor. *Id.*; *see also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).

**B**

The Kansas Department of Aging and Disability Services (KDADS) is tasked with providing competency evaluations and competency restoration treatment. Doc. 1 at ¶ 52.[1] The agency oversees and manages four state hospitals and institutions, including Larned State Hospital. *Id.* at ¶¶ 48–50. Larned is the only inpatient facility in Kansas with a forensic unit capable of performing competency evaluations and competency restoration treatments. *Id.* at 51. Plaintiffs are the advocates for specified criminal defendants and the criminal defendants themselves who either have been ordered by the judge presiding over their criminal prosecution to receive competency evaluations or have been deemed incompetent to stand trial and thus ordered to submit to restoration treatment.[2] Each has been required to obtain these services at Larned. *Id.* at ¶¶ 23, 27, 32, 37, 42.

---

[1] The facts in this section are largely drawn from Plaintiffs' complaint and, for the purposes of this matter, taken as true. *See O'Connor v. Bd. of Ed. of Sch. Dist. 23*, 449 U.S. 1301, 1302 (1980).

[2] For clarity, both the advocates and the state-court criminal defendants whose interests they represent are referred to as "Plaintiffs."

In Kansas criminal proceedings, a judge may raise the question of a defendant's compency. Kan. Stat. Ann. § 22-3302(a).[3] So may the criminal defendant, his or her counsel, or the prosecutor. *Id.* If the court has reason to believe that a defendant is incompetent, it must suspend the proceedings and determine the defendant's competency. *Id.* The court may do so by committing the defendant to evaluation by a state facility. *Id.* § 22-3302(c)(1)(A), (c)(2). That commitment may not exceed 60 days from the date of admission. *Id.* § 22-3302(c)(2).

If a criminal defendant is found incompetent to stand trial, a court must then order competency restoration treatment. Kan. Stat. Ann. § 22-3302(e). Kansas judges have discretion to place defendants in either outpatient or inpatient treatment. *Id.* § 22-3303(a)(1). Once inpatient treatment has commenced, the head of the facility must certify to the court within 90 days whether the defendant "has a substantial probability of attaining competency to stand trial in the foreseeable future." *Id.* § 22-3303(e)(1). If so, a court will order a defendant detained for treatment. *Id.* § 22-3303(e)(2). This detention cannot exceed six months. *Id.* If a defendant's competency cannot be restored in six months, a court usually must order the prosecutor to initiate civil commitment proceedings. *Id.* § 22-3303(e)(3). Notably, the six-month clock does not begin to run until a defendant is admitted to a state facility or treatment has begun. *See id.* §§ 22-3302(c)(2), 22-3303(e)(2).

Demand for beds at Larned has outstripped available capacity. *See* Doc. 15 at 21. The hospital's forensic unit houses 120 beds. Doc. 1 at ¶ 65. In 2021, funding was restored for 30 additional beds, but staffing issues mean that available capacity remains at fewer than 80 beds. *Id.* at ¶ 65–67; Doc. 15 at ¶ 13. This lack of capacity expanded Larned's backlog. At the start of 2020, there were 118 individuals waiting for admission to Larned, and that number increased to 167 by the end of 2021. Doc. 1 at ¶ 70. The Kansas Legislature heard testimony that, over that period, the average wait time for admission rose from 270 days to 336 days. *Id.* at ¶ 71 (citing *Hearing on H.B. 2697 Before the H. Judiciary Comm.*, 2021–2022 Leg. Sess. (Kan. 2022) (statement of Scott Brunner, Deputy Secretary for Hospitals & Facilities, Kansas

---

[3] Prior to this suit, the Kansas legislature passed, and the Governor signed into law, amendments to the state's competency procedures, K.S.A. sections 22-3302 and 22-3303. H.B. 2508, 2021–2022 Leg. Sess., §§ 7–8 (Kan. 2022) Those changes went into effect on July 1, 2022, after this suit was filed.

Department for Aging and Disability Services).[4] Plaintiffs say the wait time for a bed at Larned often exceeds the maximum sentence a defendant would face if he or she were competent and found guilty. *Id.* at ¶¶ 78–80.

Criminal defendants awaiting admission to Larned are often kept in county jails. Doc. 1 at ¶ 84; *see also* ¶ 75 n.16. Plaintiffs allege that these jails are ill equipped to address those awaiting competency evaluations or treatment. *Id.* at ¶¶ 84–85. Because county jails struggle to care for the severely mentally ill, Plaintiffs say, individuals awaiting competency evaluations and treatment can further deteriorate. *Id.* at ¶ 87. For example, overcrowded county jails often require "more time in cell, less privacy, less access to mental and physical healthcare, and fewer opportunities to participate in programming." *Id.* at ¶ 86 (citation omitted). Similarly, Plaintiffs contend, violent jail environments can "exacerbate existing mental health disorders." *Id.* at ¶ 87 (citation omitted). And solitary confiment, which is used to keep mentally ill individuals and others safe, might aggravate existing mental health issues. *Id.* at ¶¶ 89–94.

The State of Kansas wants to shorten the wait time for admission to Larned. For example, the Kansas Legislature passed H.B. 2508 in 2022, which "expanded the number and type of facilities that could conduct competency evaluations and restoration treatment." Doc. 1 at ¶ 99. Kansas's 2023 budget includes an additional $2.8 million for competency care in community mental health centers. Doc. 15 at ¶¶ 18–20. And KDADS provides draft orders to state judges to encourage use of H.B. 2508's outpatient options rather than placement in Larned. *Id.* at ¶ 34.

Plaintiffs are criminal defendants awaiting trial. Doc. 1 at 1, ¶ 99; *see also* n.2, *supra*. They sue Defendants Laura Howard, Mike Dixon, and Lesia Dipman in their official capacities as Secretary of KDADS, State Hospitals Commissioner, and Superindenent of Larned State Hospital, respectively. *Id.* at ¶¶ 44–46. Plaintiffs allege, pursuant to 42

[4] The increase in wait times over this period is not necessarily linear—the wait time reduced from January 2021 to April 2022 before increasing again through December 2021. *Hearing on H.B. 2697 Before the H. Judiciary Comm.*, 2021–2022 Leg. Sess. (Kan. 2022) (statement of Scott Brunner, Deputy Secretary for Hospitals & Facilities, Kansas Department for Aging and Disability Services). But over that two year period, the average wait time never fell below 264 days (August 2021). *Id.*

U.S.C. § 1983, that KDADS violates pretrial detainees' Fourteenth Amendment rights to substantive and procedural due process and to be free from cruel and unusual punishment. *Id.* at 32–34, 36–40. They also allege violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and sections 1 and 18 of the Kansas Bill of Rights. *Id.* at 32–42.

Plaintiffs moved for a preliminary injunction based solely on their Fourteenth Amendment claims. Doc. 4 at 2. After initial briefing on the preliminary injunction motion concluded, the parties were ordered to submit supplemental briefs to address additional questions raised during oral argument. Doc. 19. After conclusion of that briefing, Plaintiffs filed a motion for leave to file a sur-reply to highlight additional evidence. Doc. 27. Each of the motions is fully briefed and ripe for adjudication.

## II

The parties were requested to address, among other things, potential abstention or comity concerns or the availability of relief in state court. Doc. 21 at 11–12. The parties agree that *Younger* abstention does not prevent jurisdiction over Plaintiffs' claims, Doc. 22 at 4–5; Doc. 25 at 2, but disagree about the precise application of *Younger*. The parties also disagree whether Plaintiffs can seek relief under Section 1983 rather than in the form of a writ of habeas corpus. For the following reasons, *Younger* does not require abstention and Plaintiffs may proceed under Section 1983.

### A

The *Younger* doctrine is based "on notions of comity and federalism, which require that federal courts respect state functions and the independent operation of state legal systems." *Phelps v. Hamilton*, 122 F.3d 885, 889 (10th Cir. 1997). Generally speaking, it prevents a federal court from entertaining a suit that could interfere with ongoing state criminal proceedings. *See Younger v. Harris*, 401 U.S. 37, 45 (1971). In such a case, a federal court must abstain from exercising jurisdiction if "the state court provides an adequate forum to hear the claims raised in the federal complaint" and "the state proceedings involve important state interests." *Winn v. Cook*, 945 F.3d 1253, 1258 (10th Cir. 2019) (citation omitted). State court criminal proceedings are traditional areas of state concern and thus involve important state interests. *Id.* But Plaintiffs' request in this suit will not interfere with ongoing state criminal proceedings.

*Younger* does not apply when an injunction concerns an issue that "could not prejudice the conduct of the trial on the merits." *See Gerstein v. Pugh*, 420 U.S. 103, 108 n. 9 (1975) (challenge to pretrial detention without a judicial hearing). Plaintiffs contend that they seek only "to enjoin a *practice*, engaged in by Defendants, who are not a party to the state court litigation at all." Doc. 22 at 4 (emphasis original). This practice—"the maintenance of a wait list with unconstitutionally long wait times"—describes actions taken in response to state court orders and the speed at which executive officials take those actions. Doc. 22 at 4; Doc. 1 at ¶ 111. Plaintiffs do not challenge the state courts' processes or orders—they only want those orders enforced quicker. A state court's ability to enforce its orders as it sees fit will not change if an injunction issues in this case. *See Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1257 (10th Cir. 2022) (finding abstention not required, in the civil context, where "the injunction…would not inhibit a court from enforcing its orders and judgments"); *cf. Daves v. Dallas Cnty., Texas*, 64 F.4th 616, 622 (5th Cir. 2023) (requiring abstention under *Younger* where plaintiffs challenged state court judges' bail procedures).

Entertaining a claim whose result would require state executive branch officials to more quickly comply with a state judicial order does not necessarily interfere with or restrain state criminal proceedings. As has been noted, "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter" as a federal proceeding. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013) (citation omitted); *see also Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 816 (1976) (stating that *Younger* applies where "federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings"). A court need only abstain from "undue interference with state proceedings." *Jacobs*, 571 U.S. at 72. Undue interference includes "enjoining [a] state prosecution." *Id.* (referencing *Younger*). Still, a "federal court[] ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant." *Id.* at 73 (citation and internal quotation marks omitted). It "should not refuse to decide a case" out of mere "deference to the States," since "[c]ircumstances fitting within the *Younger* doctrine…are 'exceptional.'" *Id.*

Plaintiffs' claims certainly relate to pending state-court criminal proceedings. But Plaintiffs do not challenge the state courts' orders, process by which the state court enforces its orders, or the state court judges' powers to manage their cases. Rather, their challenge involves only state executive branch defendants who are outside of and not

involved in the state judicial process. An injunction would affect the state courts' orders only by causing state officials to more quickly comply with the state court orders in criminal cases. Since federal relief would not interfere with Plaintiffs' state proceedings, there is no basis for abstaining under *Younger*. *See Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982); *see also Indiana Prot. & Advoc. Servs. Comm'n v. Indiana Fam. & Soc. Servs. Admin.*, 630 F. Supp. 3d 1022, 1030 (S.D. Ind. 2022), *appeal dismissed*, No. 22-2744, 2023 WL 2710284 (7th Cir. Mar. 2, 2023) (finding no *Younger* issue under near-identical circumstances).

**B**

Defendants argue that jurisdiction is nonetheless lacking because Plaintiffs must seek relief in habeas corpus, not through Section 1983. Doc. 25 at 3–6. "Congress has determined that a petition for writ of habeas corpus, not a § 1983 action, 'is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement,' including confinement pending trial before any conviction has occurred.'" *McDonough v. Smith*, 139 S. Ct. 2149, 2157 n.6 (2019) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 490–91 (1973). When that is the case, "and the relief [an individual] seeks is a determination that he is entitled to . . . a speedier release from imprisonment, his sole federal remedy is a writ of habeas corpus." *Preiser*, 411 U.S. at 500; *see also Palma-Salazar v. Davis*, 677 F.3d 1031, 1037 n.2 (10th Cir. 2012) (collecting cases regarding types of claims cognizable under § 2241).

Plantiffs challenge neither the fact nor the length of their confinement. *Contra* Doc. 25 at 2–3. To start, they do not challenge their commitment orders. Doc. 22 at 6. And although Plaintiffs describe their relief in durational terms, *see* Doc. 17 at 14, their requested relief would not "*inevitably* affect[] the '*duration* of [their] custody.'"[5] *Gee v. Murphy*, 325 F. App'x 666, 670 (10th Cir. 2009) (quoting *McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 812 (10th Cir. 1997)) (emphasis in original).

---

[5] Defendants correctly note that Plaintiffs couch their relief in durational language. Doc. 25 at 3; *see* Doc. 17 at 14 (saying that Plaintiffs' procedural due process claims "challenge the constitutionality of the length of confinement itself" and "it is the duration of Plaintiffs' confinement…that directly violates procedural due process"). Even so, success on the merits of Plaintiffs' claims would not determinatively shorten their confinement. *Cf. Preiser*, 411 U.S. at 487 (finding that deprivation of good-conduct-time credits had determinative effect on duration of claimant's confinement).

Plaintiffs' core complaint is that the competency restoration process should be faster. But forcing Defendants to accelerate that process does not necessarily mean that a criminal defendant will spend less time in custody.

For example, earlier admission to Larned will expedite a detainee's competency restoration treatment. Treating a detainee requires a new setting, but it need not lead to fewer days in custody. Nothing suggests that a detainee whose competency is restored will proceed immediately to trial and/or be released. So he or she will likely return to custody even after his or her competency is restored. *E.g.*, Doc. 1 at ¶ 21–22 (noting that detainee was incarcerated before competency restoration order). And if a detainee's competency is not restored, they could be involuntarily committed, *see* Kan. Stat. Ann. § 22-3303, further extending their time in custody. Success in Plaintiffs' Section 1983 action would therefore not necessarily reduce their overall term of confinement. *See Heck v. Humphrey*, 512 U.S. 477, 482 (1994); *see also Garcia v. Spaulding*, 324 F. Supp. 3d 228, 234 (D. Mass. 2018) ("[T]ransfer to a non-penal setting to serve civil confinement implicates neither the validity of the commitment nor its duration. . . . Any effect on the duration of the commitment as a result of mental health improvement is incidental."). Because Plaintiffs challenge neither the fact nor the duration of their confinement, habeas is not their exclusive remedy.

Stated differently, Plaintiffs may proceed under Section 1983 because their claims challenge conditions of confinement. Defendants resist this conclusion, arguing that even if Plaintiffs' requested remedy does not clearly challenge the fact or duration of confinement, it still seeks a "quantum change" in confinement that is cognizable only in habeas. Doc. 25 at 5–6. It is not clear that the Tenth Circuit has adopted the quantum change approach as such. *See Gee v. Murphy*, 325 F. App'x 666, 669–70 (10th Cir. 2009) (stating that "the Tenth Circuit has not countenanced the use of [habeas relief] as a vehicle for challenging circumstances of confinement unrelated to the fact or duration of a prisoner's custody"). But the Tenth Circuit does distinguish "prison condition suits brought under civil rights laws" from "execution of sentence matters brought under § 2241." *McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 812 (10th Cir. 1997).

So the question remains whether Plaintiffs' claims properly challenge the conditions, rather than degree, of their confinement. Defendants identify cases in which transfers from prisons to hospitals were limited to habeas relief. Doc. 25 at 6 (citing *Heath v. Hanks*, 433 F. Supp. 3d 221, 226 (D.N.H. 2019); *Garcia v. Spaulding*, 324 F. Supp. 3d

228, 234 (D. Mass. 2018)). Both *Heath* and *Garcia* involved a civilly-committed individual's request to be transferred from a penal setting to a state hospital. 433 F. Supp. 3d at 226; 324 F. Supp. 3d at 234. In both cases, the plaintiff's request affected the degree—not condition—of their confinement. *Id.* Accordingly, a writ of habeas corpus was an appropriate remedy. *Id. Garcia* noted that an individual's claim sounds in habeas "if he seeks a categorical change in the level of confinement" such as moving "from prison to a hospital facility." 324 F. Supp. 3d at 234. Likewise, *Heath* held that the complainant in that case sought "to change his level of confinement fundamentally from prison…to a hospital facility[.]" 433 F. Supp. 3d at 226 (citing *Garcia*, 324 F. Supp. 3d at 234). The Seventh Circuit's decision in *Graham v. Broglin* coined the "quantum change" label to describe these fundamental changes. And like *Heath* and *Garcia*, it framed the issue this way: "[t]he difficult intermediate case is where the prisoner is seeking not earlier freedom, but transfer from a more to a less restrictive form of custody." *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991).

Unlike in *Graham* and related cases, Plaintiffs do not request transfers. There is already a state court order directing that they be moved "from a prison to a hospital facility" whether or not this suit succeeds. *Garcia*, 324 F. Supp. 3d at 234 (citing *Gonzalez-Fuentes*, 607 F.3d at 873–74); Doc. 26 at 4. Plaintiffs seek only to expedite Defendants' execution of those orders and prevent Defendants from effectively warehousing detainees while they await space at Larned. Plaintiffs therefore do not seek to change their "level of confinement fundamentally from prison to a hospital setting." *Heath*, 433 F. Supp. 3d at 226 (citing *Garcia*, 324 F. Supp. 3d at 234). Any change in Plaintiffs' level of confinement is incidental to their requested relief. Since their challenge does not attack either the fact or duration of their commitment, their claims may proceed under Section 1983. *See Health Disability L. Ctr. v. Utah*, No. 2:15-CV-00645-RJS, 2016 WL 5396681, at *1 (D. Utah Sept. 27, 2016) (considering analogous claims brought under Section 1983).

**III**

Plaintiffs have not made a strong showing that they are likely to succeed on the merits of their claims that Defendants' actions violate their substantive and procedural due process rights and subject them to cruel and unusual punishment. *Contra* Doc. 5 at 12. Nor have they shown that they are likely to suffer irreparable harm outweighing any harm to Defendants, or that the public interest favors an injunction. Accordingly, their motion for a preliminary injunction is denied.

**A**

Plaintiffs have asserted three constitutional claims that they contend support their request for injunctive relief. For each claim they are unable to satisfy the heavy burden of demonstrating a likelihood of success on the merits.

**1**

Plaintiffs seek an injunction based on the argument that Defendants' conduct violates their substantive due process rights arising under the Fourteenth Amendment. Doc. 5 at 13. They are not entitled to an injunction because they have not shown, at least to the degree required to obtain a disfavored preliminary injunction mandating affirmative action, that this claim is likely to succeed on the merits.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Substantive due process bars 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Abdi v. Wray*, 942 F.3d 1019, 1027 (10th Cir. 2019) (quoting *Brown v. Montoya*, 662 F.3d 1152, 1172 (10th Cir. 2011)). "The Supreme Court has described two strands of the substantive due process doctrine." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008). Only one is relevant here. It applies to government policy that infringes a right—fundamental or otherwise—without sufficient justification. *See Abdi*, 942 F.3d at 1027 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721–22 (1997)); *Cf. Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 n.1 (10th Cir. 2015) ("[T]he 'arbitrary or conscience shocking' test is the appropriate one for executive action.").

The substantive due-process analysis for this type of a claim proceeds in several steps. *Abdi*, 942 F. 3d at 1028. First, it must be determined whether the right at stake is fundamental—that is, whether it is "objectively among those 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Id.* (quoting *Glucksburg*, 521 U.S. at 720–21). A court then "applies the level of review that corresponds to the right identified." *Dawson v. Bd. of Cnty. Commissioners of Jefferson Cnty., Colorado*, 732 F. App'x 624, 629 (10th Cir. 2018). Interference with "fundamental" rights must be "narrowly tailored" to serve a compelling interest. *Glucksberg*, 521 U.S. at 721. Interference with non-fundamental rights triggers less scrutiny. In those cases, the government need only have a legitimate interest reasonably

related to the policy that interferes with the non-fundmental right. *Id.* at 735.

**a**

Plaintiffs identify three rights and contend that Defendants unconstitutionally infringe each of them. Specifically, they assert the rights to be "free from incarceration absent a criminal conviction," to "timely receiv[e] the competency evaluation or restoration treatment that would allow them to stand trial," and to "receiv[e] a speedy trial." Doc. 5 at 13. The following explores the nature of the rights identified and the impact of the alleged interference with them.

Plaintiffs first claim that Defendants are violating their right to be free from incarceration absent a criminal conviction. Doc. 5 at 13. The initial question compelled by *Glucksberg*—whether this right is fundamental—has been answered by the Tenth Circuit: a detainee may have a constitutional interest in freedom from detention intended as punishment, but that right is not fundamental. *United States v. Deters*, 143 F.3d 577, 583 (10th Cir. 1998) (citation omitted); *Dawson v. Bd. of Cnty. Commissioners of Jefferson Cnty., Colorado*, 732 F. App'x 624, 631 (10th Cir. 2018).

The Supreme Court explained in *Salerno* that it could not "categorically state that pretrial detention offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *United States v. Salerno*, 481 U.S. 739, 751 (1987). The Tenth Circuit has consistently stated that *Salerno* and its progeny do not make freedom from pretrial detention a fundamental right triggering strict scrutiny. For example, *Deters* recognized that *Salerno* "did not appear to apply the narrowly-tailored-to-serve-a-compelling-government-interest test that traditionally governs cases involving fundamental rights." *Deters*, 143 F.3d at 583 (citing 481 U.S. 739, 749 (1987)). *Dawson* noticed the same thing, and highlighted *Salerno*'s use of rational basis review. *Dawson*, 732 F. App'x at 631; *see also id.* at 637–38 (Tymkovich, C.J., concurring) (distinguishing the Tenth Circuit's approach to detention challenges from the Ninth Circuit's strict scrutiny approach).

While they do not do so explicitly, the parties appear to accept that this right is not fundamental. For example, they focus their arguments on the question whether Defendants can survive rational basis review. *See, e.g.*, Doc. 22 at 18; Doc. 15 at 9. And Plaintiffs' supplemental

briefing, filed following the initial hearing, reinforces this conclusion. They say that they have a "well-established and deeply-rooted fundamental right against prolonged detention that bears no reasonable relation to the purpose of their confinement." Doc. 22 at 16. That right exists and it is important, *see Deters*, 143 F.3d at 583, but is not fundamental as that term is used in *Glucksberg*. In other words, it still cannot be "categorically stated" that commitment of criminal defendants incompetent to stand trial itself "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Salerno*, 481 U.S. at 751. Rather, pretrial detainees have a right to be free from detention-as-punishment absent a conviction because punitive detention does not "reasonably relate to a legitimate governmental objective." *Dawson*, 732 F. App'x at 632.

Plaintiffs next assert a right to "timely receiv[e] the competency evaluation or restoration treatment that would allow them to stand trial." Doc. 5 at 13. But they cite nothing that would suggest that this alleged right is "'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Glucksburg*, 521 U.S. at 720–21. Indeed, they do not discuss the nature of this right at all. *See generally* Doc. 5 at 13–20. It would appear that Plaintiffs envision this right working in tandem with or as a consequence of Plaintiffs' asserted right to be free from incarceration absent a conviction. Doc. 22 at 16. To the extent that is so, that right, as previously discussed, is not fundamental. *See Dawson*, 732 F. App'x at 631.

Plaintiffs' third argument asserts a liberty interest in "receiving a speedy trial." Doc. 5 at 13. They rely on the Fourteenth Amendment for this claim, rather than the Bail Reform Act, 18 U.S.C. §§ 3141-3150, Speedy Trial Act, 18 U.S.C. §§ 3161-3174, or Sixth Amendment. But the Tenth Circuit has indicated that, "where established nonconstitutional and constitutional remedies exist, defendants should not force [a] district court into a substantive due process analysis without also allowing it to evaluate more restrained means of granting relief." *United States v. Jarvis*, 299 F. App'x 804, 809 (10th Cir. 2008). Although *Jarvis* is unpublished, the reticence towards categorizing that right as one involving substantive due process is well supported. *Jean v. Nelson*, 472 U.S. 846, 854 (1985) ("Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.") (citations and quotations omitted); *Spector Motor Co. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we

ought not to pass on questions of constitutionality…unless such adjudication is unavoidable."); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) ("[W]e have always been reluctant to expand the concept of substantive due process[.]") (citation and quotations omitted).

It is true, as Plaintiffs imply, that "the right of an accused to freedom pending trial is inherent in the concept of a liberty interest protected by the due process clause of the Fourteenth Amendment." *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010) (discussing the concept in a denial of bail context); Doc. 5 at 13 (referencing speedy trials). And *Jarvis* clearly suggests that such claims are sometimes availiable: "Defendants may choose to present a due process claim *in addition to* claims under the Bail Reform Act, the Speedy Trial Act, and/or the Sixth Amendment right to a speedy trial, as appropriate[.]" 299 F. App'x at 809 (emphasis in original). But in general, a court should "decline to plow new ground under the Due Process Clause until there is no alternative." *Id.* at 806. Plaintiffs might have alternatives, but do not argue them one way or another. *See generally* Doc. 5. It is therefore inappropriate, at this stage, to extrapolate a fundamental right to "receiv[e] a speedy trial," Doc. 5 at 13, as "protected by the due process clause" in a novel case about speedy competency treatment based upon more generalized notions of pretrial bail. *Dodds*, 614 F.3d at 1192 (citation omitted).

**b**

Interference with Plaintiffs' non-fundamental right to a reasonable period of detention is not unconstitutional in every case. The question becomes whether Plaintiffs' confinement awaiting admission to Larned "bear[s] some reasonable relation to the purpose for which the[y] [are] committed." *Glatz v. Kort*, 807 F.2d 1514, 1518 (10th Cir. 1986) (quoting *Jackson*, 406 U.S. at 738), or instead amounts to unconstitutional punishment. Defendants' interests in bringing competent defendants to trial and maintaining adequate services at Larned are not in dispute, but Plaintiffs contend that the wait times bear no reasonable relation to the purpose of their commitment, which is to evaluate or restore their competency to stand trial. Doc. 5 at 14.

Plaintiffs have not demonstrated a strong likelihood of success on the merits of their substantive due process claim. Fundamentally, they argue that KDADS's delay amounts to unconstitutional punishment because time spent in jail neither evaluates nor treats a detainee. No court explicitly declares that all pre-admission detention is punishment.

*E.g.*, *Disability L. Ctr. v. Utah*, 180 F. Supp. 3d 998, 1012 (D. Utah 2016). Plaintiffs recognize as much and request only an injunction "to prohibit KDADS from maintaining a waitlist with wait times in excess of 30 days." Doc. 5 at 1. So the question is when a state crosses the line from necessary delay to irrational punishment—and whether KDADS has crossed that line.

*Jackson v. Indiana* provides little guidance in determining a reasonable duration of commitment. It does not establish a bright line as to what length of confinement categorically violates the Due Process Clause. *Jackson*, 406 U.S. at 739. *Jackson*'s only guidance is that indefinite detention is unreasonable without a civil commitment proceeding, and that three and one-half years, the length of commitment in that case, is a presumptively unreasonable period of confinement. *Id.*

Without guidance to determine what length of commitment is reasonable within those boundaries, cases determining the reasonable extent of pretrial detention are instructive.[6] Like in the commitment context, there is no definite point at which the duration of a pretrial detention transitions from permissive to punitive. *United States v. Salerno*, 481 U.S. 739, 747 n.4 (1987). Nonetheless, "the Tenth Circuit has recognized that at some point, pretrial detention may become so protracted as to violate due process." *United States v. Dermen*, 779 F. App'x 497, 506 (10th Cir. 2019) (citing *United States v. Theron*, 782 F.2d 1510, 1516 (10th Cir. 1986)). This is a case-specific inqurity that considers "(1) the length of detention; (2) the extent of the prosecution's responsibility for the delay of trial; and (3) the strength of the evidence upon which the detention is based." *Id.* at 506–07; *see also United States v. Cos*, 198 F. App'x 727, 732 (10th Cir. 2006) (adopting factors from *United States v. Briggs*, 697 F.3d 98, 103 (2d Cir. 2012). Each of these factors is balanced against the others to determine whether the duration of a

---

[6] Plaintiffs direct attention to cases evaluating the reasonable extent of pretrial detention as an alternative ground for finding a due process violation, Doc. 5 at 19 n.23, but those cases provide a helpful framework for determining the reasonableness of Plaintiffs' length of commitment in the first instance. Understanding that there are different interests and issues at stake, the two scenarios are sufficiently analogous to merit similar analysis, especially where there is scant guidance for independently determining the reasonable duration of an individual's commitment when found incompetent to stand trial.

pretrial detainment is reasonable.[7] *See Dermen*, 779 F. App'x at 507 (citing *United States v. Briggs*, 697 F.3d 98, 101 (2nd Cir. 2012)). Applying this balancing test, courts in this circuit have determined that pretrial detentions ranging from 14 to 31 months were not unreasonable under the circumstances. *See, e.g.*, *United States v. Peters*, No. 94-2107, 1994 WL 325419, at *1 (10th Cir. July 7, 1994) (affirming that a 31-month detention did not violate due process where defendant's release posed dangers and "virtually all" delays were due to the defendant); *United States v. Hudak*, No. CR 02-1574, 2003 WL 27384957, at *9–10 (D.N.M. Aug. 29, 2003) (finding a 14-month period of detention non-punitive where neither party was responsible for circumstances contributing to delay), *aff'd* 77 F. App'x 489 (10th Cir. 2003).

The length of Plaintiffs' confinement is substantial. As the Kansas Legislature heard, the wait time for admission to Larned ranged, on average, 264 to 336 days from the beginning of 2020 to the end of 2021. *Hearing on H.B. 2697 Before the H. Judiciary Comm.*, 2021–2022 Leg. Sess. (Kan. 2022) (statement of Scott Brunner, Deputy Secretary for Hospitals & Facilities, Kansas Department for Aging and Disability Services). State officials, including KDADS itself, recognize this suboptimal delay in the provision of evaluation and restoration services. Doc. 5 at 7–8; *see also* Doc. 15 at 11.

But it is not evident—and, importantly, not to the degree necessary to justify a mandatory injunction—that KDADS can control the delay. *See* Doc. 5 at 7 (describing state efforts to fund additional space at Larned and noting that "KDADS has stated that Larned is not able to…staff the unit due to high staff vacancy rates"). The number of individuals requiring competency evaluations and restorative services has increased 10% over the past six years. Doc. 15 at ¶ 9. And the parties agree that Larned has been experiencing, and continues to experience, staffing shortages, which limits the number of available beds and slows the rate of admissions. *See* Doc. 5 at 7, 27; Doc. 15 at ¶¶ 12, 16. Then, Defendants say, the COVID-19 pandemic exacerbated the issue. Doc. 15 at ¶ 14. Plaintiffs lay the blame for staffing shortages at KDADS's feet, intimating that the waitlist conveniently permits KDADS to "understaff and underfund" Larned. Doc. 17 at 7. But it is unclear at this point whether Plaintiffs can show that the staffing

[7] Plaintiffs admit, and Defendants do not contest, that the third factor—the strength of the evidence—does not weigh in either party's favor, Doc. 5 at 19 n.23, so it is not considered here.

shortages are within KDADS's control or that the admission delays are due to its conduct. To the contrary, KDADS and the State have taken steps to reduce wait times for receiving required competency services, which Plaintiffs do not dispute. Plaintiffs' concern is that the steps taken are insufficient—but that appears to be a policy difference, not one grounded in the Constitution.

Considering all of the circumstances, Plaintiffs have not made a strong showing that maintenance of a waitlist for Larned violates their substantive due process rights. The waitlist, although substantial, does not clearly transgress *Jackson*'s prohibition on indefinite commitment, nor does it approach *Jackson*'s presumptive limit on confinement. And it is not clear that Plaintiffs' pre-admission detention lacks "some reasonable relation to the purpose for which [they] are committed." *Glatz v. Kort*, 807 F.2d 1514, 1518 (10th Cir. 1986) (quoting *Jackson*, 406 U.S. at 738). They await space at Larned. KDADS allocates that space using a waitlist. Plaintiffs will advance through that waitlist and there is little-to-no evidence indicating that the sources of delay are within KDADS's control.

Plaintiffs' non-binding cases fail to persuade here because they largely gloss over factors outside the State's control. *Contra* Doc. 5 at 14–17. Chief among these cases is *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003). *Mink* affirmed a district court's grant of an injunction that required an Oregon state hospital to admit defendants awaiting competency restoration treatment. *Id.* at 1107, 1123. There, defendants awaited transfer in county jails for weeks or months prior to admission. Considering the due process claim in that case, the Ninth Circuit relied on *Jackson*'s rule that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.* at 1122. In the Ninth Circuit's view, the purpose of commitment was to evaluate and restore competency, and "[h]olding incapacitated criminal defendants in jail for weeks or months . . . b[ore] no reasonable relation" to that purpose. *Id.* But even *Mink* acknowledged that its holding was broader than *Jackson*'s. For example, *Jackson* involved a defendant already admitted to a mental health facility, and the Court expressly refused "'to prescribe arbitrary time limits' for the reasonable duration of pretrial commitment." *Id. Mink* also noted *Jackson*'s unusual facts: a three and one-half years commitment with no expectation of progress toward trial. *Id.* It nonetheless interpreted "the principles enunciated in

*Jackson*" to require admission for evaluation and treatment within seven days. *Id.*[8]

There are several cases reaching the result Plaintiffs seek, but they are not persuasive here. All but one of the remaining cases cited by Plaintiffs simply repeats the path cut by *Mink*, which is not surprising because most (though not all) are from courts within the Ninth Circuit. *See Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, No. C14-1178, 2016 WL 4268933 (W.D. Wash. Aug. 15, 2016) (following *Mink* and finding 14-day wait for evaluation unconstitutional); *Advocacy Ctr. for Elderly & Disabled v. La. Dep't of Health and Hosps.*, 731 F. Supp. 2d 603, 606, 621–24 (E.D. La. 2010) (following *Mink* where wait was as high as one year); *State v. Hand*, 429 P.3d 502, 506–07 (following *Mink* where wait was 76 days) (Wash. 2018); *In re Loveton*, 244 Cal. Rptr. 3d 514 (Cal. Ct. App. 2016) (affirming district court's order to admit defendants to state hospital, which was based on *Mink*); *Willis v. Wash. State Dep't of Soc. & Health Servs.*, No. C16-5113, 2017 WL 1064390, at *5 (W.D. Wash. Mar. 21, 2017) (identifying *Mink*'s holding as clearly established law and thus denying qualified immunity to state hospital officials); *J.K. v. State*, 469 P.3d 434, 442–45 (Alaska 2020) (following *Mink* where wait was more than 100 days); *Disability Law Ctr. v. Utah*, 180 F. Supp. 3d 998, 1011–12 (D. Utah 2016) (citing *Mink* and concluding that any detention under a waitlist is punishment). The one remaining case that does not rely on *Mink*, *Terry*, reaches a similar conclusion by analyzing the substantive due process issue according to *Bell v. Wolfish*, not *Jackson v. Indiana*. Doc. 5 at 17 (citing *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 945 (E.D. Ark. 2002). *Terry* concluded that lengthy pretrial detention, in addition to inadequate conditions of pre-admission detention, amounted to unconstitutional punishment. *Id.* at 942–45. But *Terry* "await[ed] the remedy phase of this litigation to attempt to determine what length of wait is constitutionally permissible." *Id.* at 944.

The cases following *Mink* conclude that pretrial detention is punishment where a detainee is held "simply because there is no room" at

---

[8] It is not clear how the district court or the Ninth Circuit settled on seven days as the constitutional boundary for pre-admission detention, but it may be because the now-superseded Oregon statute at issue required the state mental hospital to receive criminal defendants within seven days after a court deemed an individual incompetent to stand trial. Or. Rev. Stat. § 161.370(3) (1999); *see Mink*, 322 F.3d at 1115–16.

a state hospital. *E.g.*, *Disability L. Ctr. v. Utah*, 180 F. Supp. 3d 998, 1012 (D. Utah 2016); *see also Advoc. Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F. Supp. 2d 603, 610 (E.D. La. 2010) ("[Detainees] remain in jail because [the hospital] is full, not because there is any suggestion that remaining in jail might restore their competency."). But that conclusion does not follow from *Jackson*, which does not forbid all pretrial detention, only irrational pretrial detention. 406 U.S. at 738. Thus, the appropriate inquiry under *Jackson* is whether the State's *delay* is reasonably related to its asserted interest in a detainee's competency. *E.g.*, *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 822 F.3d 1037, 1045 (9th Cir. 2016) (remanding the question "what constitutes a reasonable time in which to conduct the evaluations").

Based on the current record, Plaintiffs have not established that KDADS's delay is not reasonably related to the State's asserted interests. State hospitals lack infinite capacity. Sometimes, a detainee must wait. The State has a continued interest in evaluating and restoring the competency of each detainee so that he or she may be tried. The State has a further interest in providing adequate care at Larned to accomplish that purpose, which obliges detainees to wait in line until services are available. Detainees must wait for inpatient services because numerous pressures outside of KDADS's direct control have simultaneously increased demand for treatment and created staffing shortages. KDADS addresses these issues with a waitlist. Although the waitlist is long, is not indefinite. It reflects KDADS's effort to manage the numerous external factors affecting admission rates at Larned. In other words, KDADS maintains the waitlist in order to facilitate its process for competency evaluation and restoration. The resulting delay and the State's purpose appear "reasonably related," because KDADS only delays as a way to triage care.

If KDADS could freely admit detainees to Larned and chose not to do so, *Jackson* may forbid the delay alleged in this case. But the parties appear to agree that KDADS lacks that capacity and the waitlist is an attempt to manage its scarce resources. In so doing, KDADS mitigates external pressures that would otherwise frustrate Kansas's competency evaluation and restoration processes. The current record fails to suggest that the waitlist, even if longer than reasonable minds would prefer, is not "reasonably related" to KDADS's asserted interest. In that light, Plaintiffs have not made a strong showing that their substantive due process claim is likely to succeed on its merits.

A recent case from an Indiana federal court reached a similar conclusion. *See Indiana Protection and Advocacy Services Commission v. Indiana Family and Social Services Administration,* No. 22-cv-00906, 2022 WL 4468327 (S.D. Ind. Sept. 26, 2022). In that case, the court denied a preliminary injunction under analogous factual circumstances, finding that pre-admission detention under a waitlist was "'reasonably related' to the purpose of providing competency restoration services" because the defendants were in line to receive services. *Id.* at *6. The court recognized that there may be a point at which a pre-admission detention becomes too long. That much is undeniably clear from *Jackson*. But the court also noted that *Jackson* eschewed "arbitrary time limits." *Id.* at *7. Since the plaintiffs failed to show reasonable grounds for a time limit, a preliminary injunction was not warranted.

The same is true here. *Jackson* confirms that a waitlist cannot extend indefinitely—nor may KDADS resort to a waitlist without a persuasive justification. But *Jackson* requires only a reasonable relationship between the length of detention and a state's goals. Likewise, *Jackson* discourages courts from interceding to impose arbitrary limits. At this stage, granting Plaintiffs' request would mean imposing an arbitrary limit. *See United States v. Easterling*, No. 3:16-CR-102-DPJ-FKB, 2017 WL 5894223, at *1 (S.D. Miss. Nov. 29, 2017) (rejecting due process challenge to seven months of pre-treatment detention); *contra United States v. Calderon-Chavez,* No. EP-22-CR-01664-DCG-1, 2023 WL 5345582, at *4 (W.D. Tex. Aug. 18, 2023) (concluding that "the nine-month pre-hospitalization delay that Defendant has endured here violates the Due Process Clause").

Plaintiffs attempt to draw a workable boundary on reasonableness by tying it to a detainee's possible sentence for his or her alleged offense. Doc. 5 at 19–20; Doc. 17 at 6–7. They do so by claiming that there is no legitimate state interest in "forcing someone to remain in jail for months longer than they could be sentenced under the criminal code." Doc. 17 at 7. At first blush, that sounds like it must be right. But it is not necessarily so. *See United States v. Ecker*, 30 F.3d 966, 969 (8th Cir. 1994) (citing *United States v. DeBellis*, 649 F.2d 1 (1st Cir. 1981) (affirming where defendant was committed for determination of competency for longer period than the maximum possible sentence he faced)). First, the exclusive means to challenge to the fact or duration of confinement is a writ of habeas corpus, which Plaintiffs do not seek. *McDonough v. Smith*, 139 S. Ct. 2149, 2157 n.6 (2019). And second, Plaintiffs have not made a strong showing that KDADS's

administration of the waitlist—whether prioritization based on the charge or or the length of the wait in total—is constitutionally unreasonable. Pre-treatment delay that exceeds a detainee's possible sentence is undoubtedly concerning. But this fact does not itself compel intervention.

**2**

Plaintiffs argue next that maintenance of the waitlist into Larned violates their procedural due process rights. Doc. 5 at 20–23. They do not argue that the procedures the state courts employed prior to ordering evaluations and restoration services were constitutionally defective. Rather, they argue that the waitlist is itself a procedure that has erroneously deprived them of liberty and that Defendants have failed to institute procedures that would reduce their pre-admission detention. *Id.* at 22. Plaintiffs do not demonstrate a strong likelihood of success on the merits of their procedural due process claim, which largely repackages their substantive due process claim.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The key question in a procedural due process claim is what degree of process is due before the government may deprive an individual of a protected interest. *Becker v. Kroll*, 494 F.3d 904, 918 n.8 (10th Cir. 2007).

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (citation omitted). Generally speaking, the *Matthews* balancing test requires courts to consider "the private interest that will be affected by the official action," "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335. These factors are malleable and can apply in a variety of contexts. *See, e.g.*, *United States v. Muhtorov*, 40 F.4th 558 (10th Cir. 2022) (addressing whether *Mathews* required, among other things, an adversarial proceeding to determine discoverability of FISA materials).

Plaintiffs' identified liberty interests are significant. They include-freedom from incarceration, receipt of competency evaluations and/or treatment in a reasonable time, and timely progress to trial. Doc. 5 at 21. But they seek substantive, not procedural, safeguards for these interests. In other words, their complaint is not that they are entitled to adequate (whether more or different) process before being added to a lengthy waitlist. Instead, they argue that KDADS cannot use a waitlist at all, and must change its processes to achieve the substantive result that they seek. Doc. 5 at 21. But the entire point of procedural due process claims is to require a fair process, regardless of the substantive result of that process. *Cf. Edwards v. Balisok*, 520 U.S. 641, 645 (1997) ("[Plaintiff's] claim posited that the procedures were wrong, but not necessarily that the result was. The distinction between these two sorts of claims is clearly established in our case law[.]"). Indeed, it is axiomatic that the Fourteenth Amendment does not guarantee that no deprivation will occur, only that it will not occur without access to appropriate process. *Mathews*, 424 U.S. at 332–33 (citation omitted); *see also Salazar v. City of Albuquerque*, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011) (finding that a plaintiff failed to allege inadequate process because "[a] citizen is entitled to process [but] is not necessarily guaranteed a win"). Most often, that means notice and meaningful opportunity to be heard. *Matthews*, 424 U.S. at 333.

Plaintiffs do not seek additional such opportunities. They argue that the substantive result following their existing opportunity—provided by the judicial officer ordering a competency evaluation—is inadequate. This process is inadequate, they argue, because the result often consigns a detainee to months on a waitlist pending space at Larned. But as discussed, that objection attacks the substantive outcome, not the procedures that produced the outcome.

Plaintiffs' request is unlikely to succeed because it confuses this framework. They seek only to avoid "[un]timely competency evaluation and restoration treatment" that flows from the state criminal procedures. Doc. 5 at 22. This request is not about a lack of procedure, it is about the result regardless of the procedures employed. Plaintiffs therefore fail to demonstrate a likelihood of success on the merits of

their procedural due process claim.[9] *See, e.g.*, *Bettendorf v. St. Croix Cnty.*, 631 F.3d 421, 426 (7th Cir. 2011) ("[Plaintiff] conflates substantive and procedural due process, stating that the facts and the law supporting both claims are 'largely indistinguishable.' We disagree with this characterization."); *Pegues v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll., LSU Sch. of Dentistry & Fac. Dental Prac.*, No. CV 18-2407, 2019 WL 1544366, at *9 (E.D. La. Apr. 9, 2019) (rejecting substantive due process claim because plaintiff "conflate[d] substantive due process…with procedural due process"); *Simms v. Barbour*, No. 3:09-CV-84-DPJ-FKB, 2010 WL 5184845, at *2–3 (S.D. Miss. Dec. 15, 2010) (claim not properly presented because the "Complaint conflates…substantive and procedural due process"); *Oliver v. Bd. of Regents of Univ. Sys. of Georgia*, No. 3:06-CV-110 CDL, 2008 WL 2302686, at *9 (M.D. Ga. May 30, 2008) ("Plaintiff improperly conflates his substantive and procedural due process claims.").

**3**

In their third claim, Plaintiffs contend that Defendants subject them to cruel and unusual punishment—failing to admit detainees to Larned, they say, is deliberate indifference to their inhumane confinement in county jails.[10] Doc. 5 at 23–29. Once again, Plaintiffs do not show a strong likelihood of success on the merits.

The Eighth Amendment prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. That protection extends to pretrial detainees via the Fourteenth Amendment. *Estate of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022). Challenges to prison conditions or failure to meet medical needs are both analyed under the deliberate indifference standard. *Id.* (medical needs); *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 809 (10th Cir. 1990) (conditions).

---

[9] Notably, Plaintiffs cite no analogous caselaw supporting their procedural due process claim. They cite well established, generally applicable procedural due process principles, but no case cited supports the unique construction of their claim in this particular context. *See generally* Doc. 5 at 20–23. This absence of authority is notable given the robust discussion of substantive due process in the pre-treatment detention context. *See, e.g.*, *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1011, 1121 (9th Cir. 2003).

[10] Formally, they rely on the Eighth Amendment as applied through the Due Process Clause of the Fourteenth Amendment. Doc. 5 at 23.

Deliberate indifference has two components, one objective and the other subjective. "The focus of the objective component is the seriousness of the plaintiff's alleged harm, while the focus of the subjective component is the mental state of the defendant with respect to the risk of that harm." *Estate of Beauford*, 35 F.4th at 1262.

**a**

Plaintiffs first argue that Defendants have been deliberately indifferent to the substantial risk of harm that arises from keeping them and other similarly situated individuals in solitary confinement. Doc. 5 at 24–25. They substantiate this argument with a report from Dr. Joel Dvoskin. *Id.* at 2. Even assuming that Dr. Dvoskin's testimony demonstrates an objective substantial risk of harm to Plaintiffs, they have not shown a likelihood that their claim will succeed because there is no showing that these Defendants subjectively knew of and have disregarded the particular risk at issue in this case. Success requires that Defendants themselves be deliberately indifferent. *See Mitchell v. Maynard*, 80 F.3d 1433, 1444 (10th Cir. 1996). Yet Defendants have no present control over the conditions of a detainee's confinement before his or her admission to Larned. Their personal participation, if any, depends upon several layers of abstraction and deduction that the current record does not support.

Plaintiffs resist this lack of subjective culpability. They argue that the Kansas commitment statute makes KDADS responsible for Plaintiffs' conditions of confinement even though detainees reside in county jails. Doc. 5 at 24–27. This is so, Plaintiffs contend, because the "Defendants' policy of operating a long waitlist . . . *consigns* Plaintiffs to county jails for periods of weeks, months, or even years." *Id.* at 26–27. But KDADS has not "consigned" anybody—each detainee started their detentions in county jail prior to their competency hearings or evaluation orders. Doc. 1 at ¶¶ 21–24, 25–28, 31–33, 35-38, 40–43. And despite their assertions, Plaintiffs point to no specific provision of the Kansas commitment statutes that effects a transfer of authority after an order has issued but before transfer has occurred. Doc. 5 at 27–28. Plaintiffs' cited cases—all non-binding—confirm that the parties responsible for jail conditions are the officials in the county jails. *See, e.g.*, *Ind. Protection & Advocacy Servs. Com'n v. Com'r, Ind. Dep't of Corr.*, 2012 WL 6738517, at *23 (S.D. Ind. Dec. 31, 2012) (holding that *prison officials'* segregation of mentally ill prisoners in segregation units amounted to deliberate indifference).

Even if officials as attenuated as Defendants could be liable, Plaintiffs do not show how. The parties were requested to identify a case wherein a deliberate indifference claim was based on a delay in processing a transfer. Doc. 21 at 19. Even with the benefit of supplemental briefing, Plaintiffs have not done so. They have not shown a likelihood of success on the merits of their condition-based deliberate indifference claim.

**b**

Plaintiffs next argue that Defendants are deliberately indifferent to their medical needs because Defendants know Plaintiffs need mental health services at Larned yet refuse to admit them for care. A medical need claim exists in the deliberate indifference framework.. That framework has both an objective and a subjective component. *Estate of Beauford*, 35 F.4th at 1262. Plaintiffs do not make a strong showing of either component.

Start with the objective component. The objective component of a medical need claim requires evidence that the medical need is "sufficiently serious." *Estate of Beauford*, 35 F.4th at 1262 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). A plaintiff's disagreement with a prescribed course of treatment does not establish a constitutional violation. *Perkins*, 165 F.3d at 811.

Some Plaintiffs have diagnosed mental illnesses, *see, e.g.*, Doc. 1 at ¶ 24, but others do not. Indeed, Plaintiffs state that some "*have not been diagnosed with a mental illness and none have been found to be dangerous by any medical professional*," and thus are only on the waitlist to receive treatment "so they can assist in their defense at trial." Doc. 17 at 13 (emphasis original). This raises the question whether competency evaluation and restoration treatment is required to address a sufficiently serious medical need or rather to rehabilitate a defendant enough to satisfy due process. It is not clear that these two circumstances are coextensive, and Plaintiffs offer nothing more than a conclusory statement that "[a]ny actual or suspected mental illness that could result in an individual being found incompetent to stand trial must, by necessity, be considered a serious medical condition for purposes of the Eighth Amendment." Doc. 5 at 28. And for those plaintiffs that do not have a

diagnosis, Plaintiffs do not argue that their need for a doctor's treatment is obvious to a lay person. *Estate of Beauford*, 35 F.4th at 1262 (citation omitted).

But even assuming an objectively serious medical condition for all detainees exists, the claim fails at this stage because there is no evidence to satisfy the subjective component of Plaintiffs' claim. The subjective aspect of deliberate indifference requires a plaintiff to establish "that a prison official had 'a sufficiently culpable state of mind.'" *Estate of Beauford*, 35 F.4th at 1262. That is, an official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "also draw the inference." *Id.* at 1263 (citing *Farmer*, 511 U.S. at 837).

Plaintiffs have been unable to allege that Defendants had a "sufficiently culpable state of mind." *Estate of Beauford*, 35 F.4th at 1262. First, it is not clear from the record that Defendants know the "facts from which the inference could be drawn" that any one, some, or all Plaintiffs face an excessive risk to their health or safety due to not receiving competency evaluations and restoration treatment.[11] Plaintiffs cite numerous scholarly articles regarding the health risks associated with delayed competency treatment. But nothing shows these Defendants were privy to that information. And although numerous county sheriffs voiced their concerns with the Kansas legislature about Larned's admission rate, it is not clear from the cited materials that the sheriffs disclosed the kind of mental deterioration that Plaintiffs now allege.

Assuming further that Defendants were aware of this excessive risk of harm to Plaintiffs' health and safety, Plaintiffs have not shown that Defendants have disregarded that risk. KDADS has pursued, even before this lawsuit, legislative changes and additional funding to expedite admissions to and expand capacity at Larned. Plaintiffs may disagree that these measures will expedite their own admissions. Nonetheless,

---

[11] Plaintiffs filed a motion for leave to file a sur-reply containing additional evidence from legislative sessions and testimony that shed additional light on Larned's staffing challenges and what KDADS knows about the risk of harm to criminal defendants as they await admission in county jails. Doc. 27. Sur-replies are typically sought by non-moving parties to address new information that a moving party raised for the first time in a reply brief. *See Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005). Nonetheless, Plaintiffs' motion, Doc. 27, is granted.

KDADS's efforts undercut Plaintiffs effort to demonstrate a culpable state of mind. Recall that Plaintiffs seek a disfavored preliminary injunction. Their burden is unusually high at this stage. They do not overcome it in light of critical ambiguities: KDADS's knowledge base, inference of risks, and disregard of those risks. Accordingly, Plaintiffs have not shown a likelihood of success on the merits of their claim that Defendants have been deliberately indifferent to Plaintiffs' medical needs.

**B**

Plaintiffs' inability to demonstrate the likelihood of success on the merits is a sufficient reason to deny injunctive relief. *See*, *e.g.*, *McDonnell v. City & Cnty. of Denver*, 878 F.3d 1247, 1252 (10th Cir. 2018). But it is merely one factor in a court's decision whether to grant a preliminary injunction. A federal district court must also consider whether plaintiffs "will suffer irreparable harm if the injunction is denied," whether "their threatened injury without the injunction outweighs any harm to the party opposing the injunction," and find that "the injunction, if issued, is not adverse to the public interest." *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018)). These remaining factors also undermine Plaintiffs' request for injunctive relief.

*First*, Plaintiffs have not shown that they are likely to suffer irreparable harm. "[I]n the context of constitutional claims," courts often collapse "the first and second preliminary-injunction factors, equating likelihood of success on the merits with a demonstration of irreparable injury." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019). Although detainees may "suffer each day in county jail as they wait for evaluation or treatment at Larned," Doc. 5 at 4, they do not clearly suffer a constitutionally cognizable injury. Nor is that alleged injury irreparable. Plaintiffs do not challenge their confinement itself—only their delayed admission to Larned. If Plaintiffs later prevail on the merits, an injunction could require speedy admission at that time. Of course, "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001). But Plaintiffs have not shown that a constitutional right is implicated and, even if it is, that money damages would not be adequate. *See Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) ("To show a threat of irreparable harm, a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated

after the fact by money damages."). They therefore struggle to show that they suffer an irreparable injury.

*Second*, Plaintiffs' alleged injury does not clearly outweigh any harm to Defendants. For example, it is untrue that "the Plaintiffs' very liberty is at stake." Doc. 5 at 32 (citation and internal quotation marks omitted). They are already in custody pursuant to Kansas criminal procedures that they do not challenge. As Plaintiffs admit, they "are not challenging the fact or duration of their confinement or detention." Doc. 26 at 3. Rather, Plaintiffs argue that they are warehoused unnecessarily and suffer a due process injury from that delay. Remedying that alleged injury is not simple. An injunction would require Defendants to improve their procedures, an effort that is not without costs. *See* Doc. 15 at 20 (arguing that "an injunction "will only result in unsafe staffing levels at [Larned], a potential release of criminal defendants who may require incarceration, and more resources from KDADS going to litigation instead.") And because Plaintiffs do not suffer an obvious injury, their interest does not clearly outweigh Defendants'. *Cf. Free the Nipple-Fort Collins*, 916 F.3d at 806 ("When a constitutional right hangs in the balance…'even a temporary loss' usually trumps any harm to the defendant.") (citation omitted).

*Third*, and for similar reasons, an injunction is not in the public interest. At base, "it's always in the public interest to prevent the violation of a party's constitutional rights." *Free the Nipple-Fort Collins*, 916 F.3d at 807 (citation and internal quotation marks omitted). But it is not clear that an injunction here would prevent the violation of any party's right. And there are potential issues with the design and implementation of a preliminary injunction.

Defendants aver that "[i]n partnership with stakeholders, [they] are implementing improvements, advocating for additional funding…and working towards less time spent in local jails awaiting treatment." Doc. 15 at 21. Plaintiffs' request, then, largely duplicates Defendants' existing efforts. It differs primarily in that Plaintiffs prefer court-enforced benchmarks—i.e., "a preliminary injunction to prohibit KDADS from maintaining a waitlist with wait times in excess of 30 days." Doc. 5 at 1. Defendants contend that such "[i]nterference by this Court at this time…will only delay KDADS' ability to progress." Doc. 15 at 21. And while it is true that court interference may be contrary to the public's interest in conducting sensitive matters free of outside influence, *e.g.*, *Int'l Bhd. of Boilermakers v. Baca*, No. 23-2250-EFM, 2023 WL 4881872, at *7 (D. Kan. Aug. 1, 2023), this is not necessarily one of those cases.

Even if an injunction issued, KDADS would be free to pursue its own reform efforts. Nothing would prohibit KDADS from, for example, "collaborat[ing] with stakeholders…to recommend amendments to Kansas['s] competency statutes." Doc. 15 at 21. Still, Plaintiffs request federal court intervention where none may be necessary. Any such intervention runs the risk of destabilizing broad efforts at reform. Without a clear demonstration of constitutional necessity, intervention is not in the public interest. *See Free the Nipple-Fort Collins*, 916 F.3d at 807 (approving grant of a preliminary injunction where the district court analyzed likely success alongside public interest).

**IV**

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction, Doc. 4, is DENIED.

It is so ordered.

Date: December 18, 2023

s/ Toby Crouse
Toby Crouse
United States District Judge